## Carroll *et al. versus* The Commonwealth.

1. Where a county constitutes a separate judicial district and has two or more judges learned in the law, two courts of Oyer and Terminer may be held therein at the same time, under the provisions of the Acts of 18th March 1875 and 7th of April 1876.

2. In a homicide case, where the jury has been sworn on the last day of the term, the court may adjourn from day to day, and proceed with the trial of the case after the expiration of the term; such continuance is within the sound discretion of the court.

3. To show the motive for the crime, it is competent for the Commonwealth to prove the existence of a secret criminal organization, and to show that one division of such organization furnished men to commit murder in compensation for a like crime by members of another division.

4. It is not error to instruct the jury that the degree of credit to be given by them to the evidence of an accomplice is exclusively within their province, if such instruction is accompanied by the advice that they should not convict upon such testimony without corroboration.

5. It is competent for the Commonwealth to corroborate the testimony of an accomplice, as to occurrences subsequent to the crime, where they explain the relations, conduct and motive of the prisoners, although they do not connect them directly with the commission of the crime.

6. This court must look at the real competency of the evidence and not at the order of its reception, and when it is found that the evidence is all finally competent, will not reverse because of the time or order of its introduction.

March 13th 1877. Before Agnew, C. J., Sharswood, Mercur, Gordon, Paxson, Woodward and Sterrett, JJ.

Error to the Oyer and Terminer of *Schuylkill county :* Of January Term 1877, No. 12.

Indictment of James Carroll, James Boyle, Hugh McGehan and James Roarity for the murder of Benjamin F. Yost.

At about 2 o'clock of the morning of July 6th 1875, Yost, a policeman in the borough of Tamaqua, Schuylkill county, was fatally shot while in the act of extinguishing a street lamp in the

western end of Broad street, in said borough. While standing
upon a ladder, in the act of turning off the gas, he was approached
by two strangers, who, after discharging their pistols and inflicting
upon him a wound from the effects of which he soon after died, imme-
diately fled in the direction from which they came. The assassins
were not known at the time and the authorities were unable to
obtain any evidence that would justify the arrest of any one. On
September 3d 1875, James Kerrigan, Michael Doyle and Edward
Kelly were arrested and placed in the Carbon county jail, charged
with the killing of John P. Jones, at Lansford, in said county.
The prisoners. having demanded separate trials, Michael Doyle
was put upon trial at Mauch Chunk, in January 1876, and during
his trial, Kerrigan made a confession, in which he implicated Thomas
Duffy, Hugh McGehan, James Carroll, James Roarity and James
Boyle, with himself, in the murder of Benjamin F. Yost. These
defendants were arrested in February and confined in the Schuylkill
county jail, charged with the murder of Yost. Duffy having demanded
a separate trial, Carroll, Boyle, McGehan and Roarity, were put
upon their trial in May 1876, and after the case on the part of the
Commonwealth had closed, and while the prisoners were submitting
their evidence, one of the jurors became ill, and after a few days
of sickness, died. The eleven jurors were discharged. The case
against the four prisoners was called again for trial on the 6th of
July 1876.

The killing of Yost was not participated in by all of the defend-
ants, but it was alleged that the act itself was committed by
McGehan and Boyle, while Carroll and Roarity were charged as
accessories before the fact. Yost made a dying declaration, in which
he stated that his assailants were unknown to him by name, but
that he had seen them the evening previous to the shooting in the
saloon of James Carroll, one of the defendants.

The trial was held before Pershing, P. J., and Walker, A. L. J.
When the case was called, the trial of Thomas Munley, for the
killing of Thomas Sanger, was in progress in another court of Oyer
and Terminer of the county, and the defendants objected to the
calling of a jury at that time and the commencement of the trial
of their case during the trial of Munley, inasmuch as there had
been no order for a separate court and no separate venires for the
holding of separate courts for the trial of cases in the Oyer and
Terminer, as required by the Acts of Assembly.

The court overruled the objection and stated that under the Acts
of Assembly applying to Schuylkill county, Act of 18th March
1875, Pamph. L. 25–28, and Act of 7th of April 1876, Pamph. L.
19, the holding of two courts at the same time was legal.

A jury having been empanelled in the case on Saturday the 8th
day of July 1876, which was the last day of the term, an adjourn-
ment was had until the Monday following, and from day to day

[Carroll v. Commonwealth.]

until the 13th of July, when the trial commencing, the prisoners objected to proceeding, on the ground that the term had expired and that no precept had been issued to hold a court of Oyer and Terminer at that time, and the jury must therefore be discharged.

The court overruled this objection, and the overruling of this and the foregoing objection constituted the first assignment of error.

On the trial the Commonwealth called James Kerrigan, who had made the confession implicating the prisoners, and admittedly an accomplice in the crime, who testified that he knew the prisoners and had known Yost; that Duffy had had a difficulty with Yost and been beaten by him the winter previous to the murder; that a short time before the killing of Yost, Duffy "told Roarity that he would give him $10 for his trouble if he would shoot Yost or put him out of the way," and that Roarity replied, "All right, I will, and if I don't do it I will get two men who will do it;" that prior to this a conversation was held in Carroll's bar-room, at which Duffy, Carroll and witness were present, in which Duffy said he would get Mickey Campbell to shoot Yost, and Carroll said, "You let that alone, we will get men who will do that; Mickey Campbell don't belong to the society and it may be found out;" that Roarity told witness he had Thomas Mulhall and Hugh McGehan picked out to shoot Yost; that on the 5th of July 1875, three of the prisoners, Duffy and witness met in the kitchen of Carroll's house, Roarity having been called home by the sudden illness of his wife; that Carroll sent witness to procure the loan of a pistol; that upon inquiry Duffy said, "I am going to shoot Yost to-night;" that either Boyle or McGehan also remarked that "by God they had come three times to do this job and they were not going back until they did it;" that McGehan had Roarity's pistol, and that Carroll gave Boyle a single-barrelled pistol which he himself previously loaded, remarking "that it was a poor thing to do a job like that;" that witness conducted McGehan and Boyle to the appointed place and saw the killing of Yost; that both fired shots, McGehan firing first; that as they fled together McGehan said "he had shot Yost, that he knew he had shot him;" that witness accompanied them a part of the way to Summit Hill, whence they came, and then gave them directions as to the course to pursue to reach that point; that in subsequent conversations with Boyle and McGehan they had given him an account of the journey, and that they had not met any one but "Bob Breslin," whom they had accosted and asked for a drink of water. The witness also detailed what the prisoners had said with reference to their movements on the day following the murder, and what they had said to avoid suspicion, and to explain their whereabouts the day and night before the murder.

The Commonwealth then proposed to prove by this witness, "that there was at the date of the murder a secret or criminal association in this and adjoining counties, called the Ancient Order of Hiber-

nians, and commonly known as the 'Molly Maguires;' that all the prisoners now on trial, together with Thomas Duffy and the witness, Kerrigan, were members of the order; that for the purpose of taking revenge upon B. F. Yost, for the beating of Duffy, this association selected McGehan and Boyle to murder Yost, in consideration of the fact that other members of the society who desired the death of Yost were to select men to murder one John P. Jones, who was obnoxious to that branch of the association which furnished the men to kill Yost; that Roarity was a prominent officer of the association and active in the selection of the men to kill Yost, and that James Carroll was also a prominent officer of the association, and as such aided and abetted in the commission of the murder of Yost."

The prisoners objected, because

1. The witness has already given the origin of the conspiracy which resulted in the death of Yost, and the mode and manner of its execution, in which there was no agency by or reference to any organization or society, and the evidence proposed is therefore contradictory of what the witness has already testified to.

2. The testimony is irrelevant, because it is not proposed to prove that the prisoners entered into the agreement made in the society, in relation to the killing of Yost and Jones, or were present at the time such agreement was made.

3. The evidence proposed necessarily introduces into this case an independent offence.

To corroborate Kerrigan several offers were made by the Commonwealth, the object of which was to trace the possession and establish the identity of the pistol used by Roarity, and thereby to confirm the statements of Kerrigan made in regard thereto ; to prove that Kerrigan was met on the night of the 15th of July, on his return from Summit Hill, by one Churchill, whom he testified he had met, and to sustain various other statements made by him as to his whereabouts, at times whereof he had testified, and further to show by the mother of Robert Breslin that her son, Robert, had returned to the house at or about the time it was alleged he had met McGehan and Boyle on the road to Summit Hill.

These offers were all objected to by the prisoners, on the ground that they did not tend to connect the defendants with the commission of the crime, and that it was not competent to corroborate the testimony of an accomplice as to matters which occurred subsequent to the murder.

The court overruled all these objections, and they constitute the assignments of error from four to nine inclusive.

The comments of the court upon the character of this testimony, and its bearing upon the case, will be found in the portions of the charge of the court hereinafter given.

The Commonwealth then called James McParlan, who testified

at length, that as a detective, but in the capacity of a private person, he became acquainted with the four prisoners on trial, and that three of them, McGehan, Carroll and Roarity, confessed to their participation in the murder of Yost, both as principals and accessories before the fact, and detailed to him the circumstances attending the commission of the crime, an account of which the witness gave. His statement in this regard sustained substantially that made by Kerrigan.

The Commonwealth then made the following offer:—

"To prove by the witness on the stand, James McParlan, that as a detective he came into Schuylkill county to become familiar with the working of a secret association, known generally in this locality as 'Molly Maguires,' but the real name of which is the Ancient Order of Hibernians; that he was initiated as a member of that organization; that Hugh McGehan, James Roarity and James Carroll, the three prisoners, whose declarations witness has testified to, were members of that order or association, known to be such to the witness at the time spoken of, and that they all knew him to be a member; that it was a practice in this organization, and known to be such to the above-named prisoners, for the members to aid and assist each other in the commission of crimes and in defeating detection and punishment; that said organization was a secret one, the members of which could make themselves known to each other by signs and passwords; that the declarations of the three prisoners above referred to were made to the witness by the prisoners as a fellow-member of their organization.

"All this to be followed by proof that James Roarity was an officer of this organization, and undertook to furnish the men to murder Yost, and did actually furnish them, by selecting from the members of the organization the prisoner McGehan and one Mulhall, the latter of whom was afterwards substituted by James Boyle.

"This was done at the request of Thomas Duffy, the prisoner, who had been arrested by Yost for a previous offence, and who had threatened to be revenged on him (Yost) for the matter."

All this offer was,

"1. To show the motives for the commission of the murder; and

"2. To explain the relations existing between the witness and the three first above-named prisoners, and why the confessions and declarations already in evidence were made."

The defendants objected to the offer,

1. So far as it relates to and purposes to prove the existence of and membership of the defendants, Carroll, McGehan and Roarity, in the organization known as "Molly Maguires," as not material, and in no way tending to show the guilt of the defendants charged with the killing of Yost.

2. It is not alleged in the offer that the killing was done by the order, as such, or in any other capacity of those concerned in it.

3. It is not alleged that Duffy and Boyle are members of the society named, and therefore the offer to prove the existence of the association, and its relations to the parties named—Roarity, Carroll and McGehan—is not material upon the subject of the killing as an act of revenge for injuries done by the deceased to Duffy.

4. It is not material or relevant for the Commonwealth to give evidence of the means employed to obtain confessions from the prisoners.

5. The threats of Duffy, who was not a member of this association, cannot, and do not, appear ·to have any relation to, nor connection with, the association mentioned, and such association is not material upon the subject of motive, as set out in the same.

6. The testimony is proposed to affect such of the defendants as are not claimed to be members thereof, and as such is irrelevant.

7. The offer is irrelevant, and not material to the charges contained in the indictments.

8. The Commonwealth having produced upon the stand James Kerrigan, and proved by him the origin of the conspiracy which resulted in the death of B. F. Yost, and that the persons connected therewith acted upon their individual responsibility, and not as members of any organization, the evidence now proposed is a contradiction of the evidence of the said Kerrigan, and therefore incompetent.

9. That portion of the Commonwealth's offer which relates to the proof of the practices of the Ancient Order of Hibernians, and the membership of the prisoners in that organization, does not propose to prove that the killing of Yost was the act of the association, or that they perpetrated the crime by reason of their membership of said association, or that the practices of said association refer to the particular case now on trial.

The court overruled these objections, which was the third assignment of error.

The witness then proceeded to give in detail an account of the organization, grips, passwords and practices of the order known as the Ancient Hibernians or "Molly Maguires," showing that it was a secret organization, having its ramifications in England, Ireland and Scotland, and the various states of the Union, subdivided into state, county and district organizations, with their several officers, that of the district being termed a body-master; that the signs and passwords called "goods" were transmitted regularly from the head of the organization in Ireland to the various subdivisions through delegates at conventions; that it was the practice of the organization to assist in the commission of crimes, the design and execution of which were in the language of the witness as follows:—

"As a general thing, when an outrage was to be committed,

[Carroll v. Commonwealth.]

whether it was to kill a man, or beat him or burn his place down, or anything in that respect, the parties who wanted it done told the division master they wanted this thing done.   The division master called the men together—probably it would not be a full meeting—to talk the matter over, and see whether it was right that this man should be killed, or this place burned, or this man should be licked, as it might be.   Then the division master made a call upon some other division master, probably not living · in the same county.   There was no difference about that, but the men that were to perform this act or commit this outrage had to be men that were unknown, as a general rule, to the parties upon whom the outrage was to be committed.   This division master, in turn, pledged himself to this other division master, upon whom he made the call, to furnish men if he wanted a favor in that line of business at any time that he would ask him to furnish men to do it; consequently, the men were furnished and the job was done.

"If any of the members were arrested in the commission of any crime, the practice of the organization was to raise a fund and to retain the best legal talent they could possibly get, and the next practice was the 'alibi.'   Any members who refused to come forward and sustain the alibi when called upon were expelled, and just as like as not would be killed."

The portions of the charge and answers to points following, constituted the assignments of error from the 10th to the 15th inclusive, and are given at length, in view of the fact that it was strenuously contended on behalf of the prisoners that the testimony therein commented upon was not such evidence as should be admitted to corroborate the testimony of an accomplice.

"10.  It is a rule of evidence that the degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury.   Such testimony should be weighed with great caution.   The jury may, if they see proper, act upon the evidence of an accomplice without any corroboration of his statements.   It is usual for courts to advise juries not to convict a defendant of a felony on the testimony of an accomplice alone, and without corroboration, and we so advise you in this case.   You will carefully consider the other evidence in the case and determine how far it confirms Kerrigan's statements.   The rule on this subject is thus laid down in 'Joy on the Evidence of Accomplices,' pp. 98, 99, as the result of an elaborate examination of the authorities.   The confirmation ought to be in such and so many parts of the accomplice's narrative as may reasonably satisfy the jury that he is telling the truth, without restricting the confirmation to any particular points, and leaving the effect of such confirmation (which may vary in its effect according to the nature and circumstances of the particular case) to the consideration of the jury, aided in that consideration by the observations of the judge.

3 Norris—8

[Carroll *v.* Commonwealth.]

" 11. He, Kerrigan, then testifies to meeting there James Boyle, Thomas Duffy, Hugh McGehan and James Carroll, and says that these parties were in the kitchen, and he describes the different positions they occupied in the kitchen, and states further they proceeded to the porch, and that Carroll came out and went up the street, and coming back said, ' I could not get none,' and said he had been to John Herron's saloon and could not get none.    Kerrigan testifies that this had reference to the procuring of a revolver, and that Carroll then gave him twenty-five cents and told him to go over to Patrick Nolan's and ask for the loan of a revolver for a man going to Summit Hill or Mauch Chunk.   Kerrigan states that he went over to Nolan's and found nobody there but Nolan and his wife and a man named Patrick Coleman.   Kerrigan called Nolan into a side room and asked him for a revolver, and Nolan said he had none.   He states that then they left this side room and he treated the party, including Coleman, and there spent the twenty-five cents which had been given him by Carroll, and returned to Carroll's and found McGehan, Duffy and Boyle on the stoop, and he asked them what they wanted, and Duffy said, ' I'm going to have him, Yost, to-night.'   The witness then says that he remonstrated against the killing of Yost, as he had had a difficulty with McCarron before, and he might be blamed for the murder.  He then says that either McGehan or Boyle, and he cannot recollect which, spoke up and declared that he had come there three times to do this job and they were not going back till they did it.   He states that he saw McGehan in possession of Roarity's pistol; he states that there was a wrangle about the pistol, and that McGehan said he was all right, that he had Roarity's pistol, and he pulled it out, and the witness knew the pistol; that then Carroll went into the bar-room, went behind the counter, opened a drawer, took from it a little single-barrelled pistol, a breech-loading one-shooter, and he there saw Carroll put in the bullet and hand the pistol to Boyle, saying, at the same time, that it was a poor thing for such a job, and that Boyle put it in his pocket.

" This is the most important evidence in connection with this case, and it is your duty to scan it carefully, and to see how far it is corroborated by the other evidence.   Kerrigan does locate Roarity there at this time, and the other testimony in the case is that Roarity's wife was sick that afternoon.   To contradict this testimony, Mrs. Catharine O'Donnell was called by the defence.   She is the mother of Mrs. Carroll, and she testified that she was at Carroll's from 6 o'clock to 12 o'clock on the night of the 5th of July 1875 ; that she was in the kitchen there all the time and that these parties were not there, as testified by Kerrigan.   She states that she saw Edward Herron there, and he testifies that he was there during part of this time, and went into the kitchen for a drink of water ; and that he saw none of these parties there.   There is corroboration of this statement in the tes-

timony of Patrick Nolan, and there is a similarity of statement between Nolan and Kerrigan in every particular, except one.  Nolan testified that Kerrigan came to his house, rapped at the door, and that the door was opened by his wife, and Kerrigan came into the bar-room, where there was no person but himself, Nolan, and his wife and Patrick Coleman; that Kerrigan tapped him on the shoulder and took him into another room, and there asked him for the loan of a revolver to protect a man going to Summit Hill or Mauch Chunk, one of the two places; that he told Kerrigan he had none, and that Kerrigan then proposed to treat, and produced the twenty-five cents, and that he, Kerrigan, and Nolan drank.  Nolan alleges that he did not receive any money from Kerrigan, but that Kerrigan threw the money on the counter and he pushed it back to him. Whether Nolan took the money or not is the only discrepancy between his statement and Kerrigan's as to that part of the testimony. Kerrigan alleges that he spent the money there and Nolan alleges that he declined to receive it.    This, as far as we now recollect, is the corroboration of Kerrigan and the contradiction of his testimony in relation to this conversation.    This evidence is important as showing the connection of Carroll at least with this transaction in the preparation they had made for the killing of Yost, and showing, if you believe it, that he tried to procure a pistol, and failing to do so, furnished Boyle with the one-shooter, which he said was not sufficient for the purpose.

"12. Kerrigan testifies to other points, in which he is corroborated by other witnesses.   He testifies that Barney McCarron fired two shots after the men as they ran in the direction of the cemetery, and that McGehan fired a shot in return.   This is corroborated by the testimony of Barney McCarron, and by the testimony of Yost, and other witnesses.   One witness stated that four shots were fired, and others stated that they heard more than two.   The testimony of Kerrigan, Yost and McCarron, shows that there were about five shots fired at that time.   Kerrigan then testifies to a conversation that he had with McGehan immediately after this shooting took place.   He states that he said to McGehan, 'I know that you shot Yost, and he was not such a bad fellow.   Barney McCarron is ten times worse.'   McGehan said, 'I don't ask better sport than to put such men out of the way, but I don't like to draw an Irishman's blood.'   McGehan said he did not know whether Yost would die or not, but he knew that he shot him.   The witness in giving his testimony then comes down to the 1st of September 1875, in which he alleges a conversation with McGehan, in which McGehan said they got home all right, and said he had told Doyle and Kelley that the road they took would be a good road for them to take when they shot Jones; that they did not meet anybody but Robert Breslin, and he was a dirty fellow, who had tried to get the men to work for the company, and he was afraid that Bob would squeal on them.   Then he went on to state to Kerrigan all the de-

[Carroll *v.* Commonwealth.]

tails of a conversation that passed between them and Breslin ; that they asked Breslin for a drink, and Breslin said that he had no water there, but if they would go to the house they could get some.  McGehan said they told Breslin they had not time.  Then Breslin asked them where they had been and what they were doing there at that time in the morning, and McGehan said he and Boyle had been to a ball at Mauch Chunk, and had got lost, and did not know where they were till they got there.

"The statement alleged to have been made by McGehan to Kerrigan is corroborated by the evidence of Robert Breslin, whose testimony on this point is very important.  On this point you will judge how much Kerrigan is corroborated by what Breslin testified. You have heard the argument of the counsel upon this subject, and what was said in reference to Kerrigan's obtaining information. There is no evidence that he got it from Breslin, and you have heard the argument as to how he did get it, if he did not get it from McGehan.  If it be true that McGehan made this statement to Kerrigan, then McGehan's statement and the testimony of Breslin correspond in every particular, as far as we can see.

"Kerrigan also testifies that on this occasion, on Sunday, the 14th or 15th of July, he was in Alex. Campbell's house, and that there Roarity gave him that pistol for company on the road home. This was just after he had met Boyle at Campbell's, and he started for home about 7 or 8 o'clock in the evening, and he testified that on the road home he met Churchill and McLaughlin, and that he had possession of the pistol all that time, for five or six days.  It is claimed, on the part of the Commonwealth, that Kerrigan is corroborated here by the evidence of Churchill.  Churchill, who is a mining boss, testified that on that day, the 14th or 15th of July, as nearly as he can fix it, he was in a buggy, in company with McLaughlin, driving from Tamaqua towards his home, and that he met Kerrigan, whom he knew well, because Kerrigan had been in his employ, going on foot in the direction of Tamaqua.  Churchill testifies, further, that he had a conversation with him, and detailed to you what took place at that time.  It is claimed by the counsel that Kerrigan's statement is corroborated by the statement of Churchill.

"13. It is claimed, also, that there are other corroborations of this statement of Kerrigan.  He tells you he came home from work at 6 o'clock, about a week later than this, and that he found at his house James McKenna (or McParlan) and Patrick McNellis ; that he washed, and all took supper together, and that on that occasion he gave this Roarity pistol, as it is called, to McNellis, for the purpose of having it delivered by McNellis to Roarity, and he testifies that McKenna at that time held the pistol in his hands and made some remarks about it.  It is alleged that in this he is corroborated by McParlan, who testifies that he was at Kerrigan's house, I think on the 27th of July, and that he did take supper there, and that the

[Carroll *v.* Commonwealth.]

pistol was produced at the time by Kerrigan, and that he saw Kerrigan give it to McNellis to be delivered to Roarity, and that it was there that McParlan came to know this pistol.

"Kerrigan states that on the 1st of September he was present at McGehan's saloon, when Aleck Campbell, Michael Doyle, Edward Kelly, James Boyle and Hugh McGehan were there ; that McGehan oiled the pistols, and that one of the cartridges was too long and stuck out of the chamber, so that the chamber would not fit into the revolver, and that he took the chamber out, struck the cap with his knife and the cartridge exploded and the bullet went into the counter. He says that a man named Aubrey came in while they were there. It is alleged by the Commonwealth that in this statement Kerrigan is corroborated by the testimony of Charles Walton and J. C. Williams, who have produced here a part of the counter, showing the hole in which this bullet penetrated.

"Kerrigan states that he next saw that pistol in Aleck Campbell's bar-room, where McGehan fetched the men to shoot Jones, between 6 and 7 o'clock in the evening, and that there was no one there but Kelly, Campbell, McGehan, Doyle and himself, but that a man by the name of Goslee and a man by the name of Condon came into the bar-room, and that Condon had a coat of arms in India ink upon one of his arms and showed it. He states that they had some drinks there with Goslee, and so had Doyle and Kelly, and that he next saw the pistols at Tamaqua, at the spring, after the killing of John P. Jones, when Doyle and Kelly were arrested for that murder along with Kerrigan. It is alleged on the part of the Commonwealth, that Kerrigan is corroborated in this part of his statement by the testimony of Goslee. It is in evidence that Goslee was present at Campbell's at this time, and Goslee testifies that Kerrigan was there, and Doyle was there with three or four men, and that he, Goslee, had an argument with Condon, and that Condon rolled up his sleeve and showed the India ink marks on his arm, a statement which goes to corroborate that which was said by Kerrigan as to Goslee's and Condon's being there, and the exhibition by Condon of the marks upon his arm. There is evidence called on the part of the defence to contradict this statement of Kerrigan.

"The evidence of Kerrigan is very important in this case. If you believe his statements, it will not be, perhaps, too much to say that they are sufficient to convict all these defendants. Therefore you should scan it closely and determine how far he is corroborated in material parts of it and how far he is contradicted. We have read the rule of law as to the extent of the corroboration required on the part of an accomplice, in order that a jury may give him credence."

14. The defendant's second point was, "That under the evidence in this case James Carroll and James Roarity cannot be convicted as they are charged in this bill of indictment as direct principals,

[Carroll *v.* Commonwealth.]

and under the testimony, if guilty of any offence, it is that of accessories before the fact to the felony."

The court said: " We refuse to answer this as requested. If you find from this evidence that James Carroll and Roarity counselled, or aided or abetted the murder of Yost, that although they were not actually present when the crime was committed, they would be equally guilty with McGehan, if you believe that they actually committed the offence."

15. The defendant's fourth point was, " That the jury would not be justified in finding a verdict against the defendants upon the testimony of James Kerrigan, an accomplice in the murder of B. F. Yost, unless his testimony is corroborated in its material parts which connects the prisoners with the killing of Yost. That a corroboration of Kerrigan in such collateral matters as may be consistent with the innocence of the prisoners, is no legal corroboration and is insufficient."

" Answer. We say to you that the rule of law is that a jury may convict on the evidence of an accomplice alone, if they believe it ; but it is usual for the courts to say to the jury that they should not do it, and that they should have corroboration of his testimony before they would convict. We here say to you now, while it is the rule of law that a jury may convict on the evidence of an accomplice alone, that you ought not to convict upon the uncorroborated testimony of James Kerrigan in this case, as he is a confessed accomplice, and it will be your duty to examine his testimony, and see how far it is corroborated, and in order to determine what credence you will give to it. It should be such corroboration as will satisfy your minds of the truth of what he has stated, as we have already instructed you in the general charge (see portion of general charge under assignment 10, *ante*, page 113), to which we refer in connection with the answer to this point."

The jury brought in a verdict of murder in the first degree, and the prisoners were all sentenced to be hung. They then took this writ, and the assignments of error, among others, were those heretofore noted, and as they are respectively numbered.

*Lin Bartholomew* and *John W. Ryon*, for plaintiffs in error.— The right to hold a jury after the expiration of the term seems to be founded in necessity and to prevent a failure of justice; but no case has ever gone so far as to authorize a court to empanel a jury, or a number of juries, and keep them waiting until required. A jury removed from the care and vigilance of the court may be subject to influences illy calculated to promote the cause of justice. If one jury may be selected under such circumstances, others may be, and in important trials, involving life and liberty, the prisoner may be deprived of the benefit of the regular panel from which to select a jury, and be obliged, as here, to select from talesmen, and the safeguard provided for him thus destroyed. See Horton & Heil *v.* Miller, 2 Wright 270.

[Carroll v. Commonwealth.]

Before the offer contained in the second assignment was made, the witness, Kerrigan, had testified very fully as to the origin and extent of the arrangement to kill Yost, and had shown that the society known as the Ancient Order of Hibernians, as such, had nothing to do with it. The offer was to show the existence of this order in Schuylkill and other counties, and that as such an arrangement was made to kill Yost and John P. Jones. It was not proposed to show the presence of either defendants at any meeting at which the subject was agreed upon or that either knew of any such arrangement. While it may be conceded that a party joining a conspiracy at any stage before its completion, is responsible as a co-conspirator, it must be shown that he joined it, knowing its character and purpose, before he can be bound by the acts and declarations of others. Although the offer connects the prisoners with the killing of Yost, it does not even allege that either knew of or had anything to do with the killing of Jones.

The third assignment of error, inter alia, proposes to show that it was a practice in the organization known as Ancient Order of Hibernians, and by the persons known to be such, for the members to aid and assist each other in the commission of crimes and in defeating detection and punishment. While the ostensible purpose of this offer was to show the motive for the commission of the murder, and the relations between the witness and prisoners, the real purpose, if regarded according to the effect of evidence, was to create prejudice in the minds of jurors already excited by systematic efforts to that end. The door was thrown wide open by the offer to show a general practice to aid and assist in the commission of crimes and in the obstruction of justice, without one single allegation that either had anything to do with the offence then being tried. If a man be convicted upon the general principle that he is associated with those who are accustomed to commit crime, this evidence was competent, but if it be still a legal truth that a party shall be informed of the nature of the accusation against him, and that the evidence shall be confined to the support of some specific charge, this offer was a most violent outrage upon the rights of these defendants. The limitation put upon the admission of this kind of evidence is fully stated in Shaffner v. Commonwealth, 22 P. F. Smith 60.

The Commonwealth offered what they called corroborative evidence of the testimony of Kerrigan, which is chiefly embraced in the propositions contained in the assignments from four to fifteen, exclusive of the ninth. Some of these corroborating circumstances, to which importance is attached, relate to acts of Kerrigan which transpired some weeks after the killing of Yost, and were either of a private and lawful nature or connected with the killing of Jones. The Commonwealth corroborates the witness upon points which are not in dispute, and which do not add one scintilla to the credit of the witness, and thence deduces the result, as he has told the truth about himself, therefore he has told the truth about the prisoners. Unless the law raises the legal presumption from such

premises, the court was in error. The doctrine held by the court simply amounts to this : that if an accomplice in crime, who testifies to his own and the criminality of others, can bring to the stand some witness who can corroborate the fact of the witness' guilt, the accomplice is entitled to full credit. Judged as the law judges human motives by human actions, an accomplice in a high felony is unworthy of credit, and he gains no title to credit by evidence which simply tends to show his own guilt. Such is the drift of modern authorities : Rex *v.* Addis, 6 C. & P. 388 ; Rex *v.* Wilkes, 7 Id. 271 ; Rex *v.* Moores, Id. 270 ; Rex *v.* Wells, M. & M. 326 ; Reg. *v.* Farler, 8 C. & P. 106 ; Reg. *v.* Dyke, Id. 261.

The ninth assignment raises the question whether a witness whose credit is not attacked by the cross-examination or otherwise, can be corroborated by the party calling him in chief in the manner sought to be done in this case. In support of the position that the court erred in admitting Mrs. Breslin's evidence, reference is made to the following cases : Craig *v.* Craig, 5 Rawle 91 ; 1 Greenl. Evid. 469 ; Commonwealth *v.* Wilson, 1 Gray 340 ; Deshon *v.* Merchants' Ins. Co., 11 Metc. 199, 200.

*George R. Kaercher*, District Attorney, *Guy E. Farquhar*, *Franklin B. Gowen*, *Charles Albright* and *F. W. Hughes*, for the Commonwealth.—While the two cases were tried in the Oyer and Terminer, they were each tried by legal quorums of the judges. The jurors in the two cases were not drawn from the same panel, but each jury from a separate panel, summoned in pursuance of an order for separate *venires* for the respective weeks of 26th of June and 3d of July 1876.

The court decided that it was proper to proceed with the trial ; and it having been begun within the term, there existed no legal reason why the case should not proceed, though a conclusion was not reached till after the end of the term : Leib *v.* Commonwealth, 9 Watts 200 ; Miller *v.* Wilson, 12 Harris 122 ; Williams *v.* Commonwealth, 5 Casey 102 ; Briceland *v.* Commonwealth, 24 P. F. Smith 463. See also the following Acts of Assembly : Act of 18th March 1875, Purd. Dig. 2054 ; Act 18th April 1876, Purd. Dig. 2028 ; Act 9th April 1874, Purd. Dig. 1886 ; Act 7th April 1876, Purd. Dig. 2066.

The testimony offered under the second and third assignments was to show the motive for the murder and the relation of McParlan to the defendants at the time the confessions were made to him by Carroll, McGehan and Roarity. While the testimony, as it was before the court, showed the origin of the conspiracy in the malice and hatred of Thomas Duffy toward Yost, yet it failed to explain the readiness of the other defendants to enter into the conspiracy. But if the Commonwealth could show, as it did, under the offer now under discussion, that all the defendants were members of a secret and criminal organization, whose gen-

[Carroll *v.* Commonwealth.]

eral practice was to engage in the commission of crimes, and to aid and assist its members in escaping detection and punishment; that it was the practice of one division to aid other and distant divisions in avenging alleged injuries to its members; that the practice was for the body-master or president of a division to select the men to do the deed, and for the division which was thus favored, in its turn to furnish the men to commit any crime that might be required of them, in return for the favor; applying this practice to the facts of the case, have we not established an adequate motive on the part of the defendants, fully explaining their connection with the murder of Yost?

Where facts and circumstances amount to proof of another crime than that charged, and there is ground to believe that the crime charged grew out of it, or was in any way caused by it, such facts and circumstances may be proved to show the *quo animo* of the accused: Whart. Crim. Law 647–649; Commonwealth *v.* Ferrigan, 8 Wright 388.

An accomplice is a competent witness. It is the province of the court to determine the competency of the witness; it is for the jury to determine upon the credibility of the witness. The rule, in regard to the testimony of an accomplice, does not extend further than to require of the judge to *advise* the jury not to convict on the uncorroborated testimony of an accomplice. And the court, in this case, so advised the jury in express terms. 1 Phil. Ev. 110, 116, 117; 1 Whart. Crim. L., § 785; 1 Greenl. Ev., § 380, 381; Reg. *v.* Dunne, 5 Cox C. C. 507; Rex *v.* Barnard, 1 C. & P. 88; Rex *v.* Wilkes, 7 Id. 272; Rex *v.* Hastings, Id. 153; Reg. *v.* Stubbs, Dearsley's C. C. 555. We have the testimony of an accomplice, first, to all the acts and declarations of the parties in the furtherance of the conspiracy; second, to the acts and declarations subsequent thereto, made by the defendants on trial, in regard to their part in said conspiracy, their flight, and the possession of the instrument of death, first by one, and then another of their number. To confirm the testimony of the accomplice in all points, and also to trace the possession and establish the identity of the Roarity pistol, the Commonwealth proved, under the offers excepted to, and now assigned for error, that Kerrigan was met upon his return from Summit Hill on the night of the 15th of July, by Churchill and McLaughlin; that on the 27th of July, Kerrigan exhibited the Roarity pistol to McParlan and McNellis, and sent it by the latter to Roarity the same day; that on the 1st of September, Kerrigan and the parties named were at McGehan's saloon; that the counter in the saloon was examined, and a piece cut therefrom, and offered in evidence, which showed the mark of the bullet, and the pistol offered in evidence, showing that the ball therefrom would have occasioned the indentation therein; that the pistol, with the Roarity pistol, was found on the 4th of September, in the place where Kerrigan stated they had been placed; that Roarity confessed to McParlan, that he had lost his pistol by reason

[Carroll *v.* Commonwealth.]

of its being found in the bushes at Tamaqua; that Robert Breslin had met McGehan and Boyle on a by-path from the road to Tamaqua.

Surely, if corroboration is required of the statements of an accomplice, no rule has ever been established or declared, that the corroboration may not extend to every part of his testimony, as to the acts and declarations of the defendants.   And if a confession or statement is to be introduced in evidence, one very necessary element would seem to be, that parties who reside miles apart should be in such position as to render the making of that confession possible.

The ninth assignment of error relates to the admission of the evidence of Mrs. Breslin, who testified to the time her son, Robert Breslin, had returned home on the morning of the 6th of July.   The witness, Robert Breslin, had testified to his return home that morning, and to meeting near his home McGehan and Boyle on a by-path leading from the Tamaqua and Mauch Chunk road.   The Commonwealth simply fixed by the witness, Mrs. Breslin, the fact of the return of Robert Breslin that morning to his home and the time.

*Mr. Ryon*, in reply.—We contend that Mrs. Breslin could not corroborate her son, who was called to corroborate Kerrigan as to his whereabouts.   If this were so there might be an endless series of corroborations.   The main error in our estimation arose under the second and third assignments.   Until it had shown the conspiracy the Commonwealth had not the right to make the offer it did.   Before testimony of the character given was allowed, good legal reasons therefor should have been shown.   Its introduction was equivalent to the death warrant of these prisoners.   The connection of the prisoners with the order of " Molly Maguires" had not been shown.   Certain facts were testified to by Kerrigan, and the Commonwealth proceeded to make the offer in regard to the order.   The testimony of Kerrigan shows that the enterprise was an individual one and not inspired or arranged in the order of "Molly Maguires," and after the Commonwealth had failed to sustain their offer with his evidence we asked the court to withdraw the evidence, which was refused.   It was an attempt to show a general wicked practice and without any connection with this particular case.   It will be observed also that the conversation in regard to the trade of the death of Yost for that of Jones was after the murder of Yost and was not therefore the consideration for the murder of Yost.   If there was any consideration it was between the parties as individuals and not in pursuance of any arrangement of the order of " Molly Maguires," and we contend therefore that it was dangerous and incompetent testimony to prove the practices of an infamous organization and let it go to the jury to show that these prisoners belonged to it.

Chief Justice AGNEW delivered the opinion of the court, May 7th 1877.

[Carroll v. Commonwealth.]

The county of Schuylkill constitutes a separate judicial district, having five judges, of whom three are learned in the law, and two are associates. One of the judges learned in the law and an associate were engaged in the trial of Thomas Munley for homicide from the 27th of June until July 12th 1876. The case of these prisoners, James Carroll, James Boyle, Hugh McGehan and James Roarity, was called for trial July 6th 1876, before President Judge Pershing and Judge Walker, an associate learned in the law. In consequence of motions for a change of venue and to quash the array of jurors, the jury for this trial taken from the panel for the second week was not completed until Saturday July 8th, the last day of the term. The jury being sworn could not be discharged, and consequently the trial was laid over until the next week. Circumstances in relation to the business of the court existed, in consequence of which the actual hearing began on the 13th of July, and the trial lasted then until the 22d. It is objected that there was no power thus to continue the case from day to day after the expiration of the term. The objection is groundless. At one time this argument might have had some force, but the strictness of the common law has been beneficially removed by legislation. The two Acts of the 18th of March 1875, Pamph. L. 25, 28, the Act of 7th April 1876, Pamph. L. 19, and the decision in Briceland v. The Commonwealth, 24 P. F. Smith 463, remove all doubt of the legality of the proceedings in the court below. Under these laws it is competent, in such a district as that of Schuylkill, to hold two courts of Oyer and Terminer at the same time; to issue separate venires, and to make all necessary and convenient orders for the despatch of business. The jurisdiction was therefore complete. According to Briceland v. The Commonwealth, a trial begun on the last day of the term may be continued afterwards. A jury sworn cannot be discharged without prejudice to the interests of justice, and offenders must often escape if the mere modes and forms of procedure are to be held so strictly. The continuance of the case by adjournments from day to day, from Monday until Thursday, when the trial proper began, was a matter necessarily within the sound discretion of the court. The Court of Oyer and Terminer must know the state of its own business better than we, and what is proper in order to administer justice to all persons before the court. We cannot say that its discretion was abused. It does not appear to us that its authority was illegally exercised.

We come to the exceptions taken in the trial. On the morning of the 6th of July 1875, about two o'clock, Benjamin F. Yost was shot by two men, while he was in the act of extinguishing a lamp, in the borough of Tamaqua, Schuylkill county. Hugh McGehan and James Boyle, the men shown to have shot him, resided at Summit Hill, about eight miles distant, and were strangers to him. No motive, such as ordinarily influence men to commit so great a crime, was shown to exist on their part. They were neither insane

[Carroll *v.* Commonwealth.]

nor intoxicated, so that it might be inferred that the murder was without an ordinary motive, or done by persons unconscious of the wickedness of the act. Without a moving cause, the killing was so unreasonable and so contrary to human observation upon the commission of great crimes, the case would have been barren of those elements which lead the mind to a conviction of the guilt of persons who were not recognised at the time of the act, and against whom the evidence would have been altogether circumstantial. Under these circumstances a jury might reasonably doubt the identity of the prisoners McGehan and Boyle, and would find nothing satisfactory to rest upon for the conviction of James Carroll and James Roarity, the prisoners indicted jointly with them, but who were not present at the commission of the homicide. That the evidence as given convicts all of the murder is beyond a reasonable doubt, yet this certainty of the proof was to be solved by facts more strange, unnatural and horrible than ever disclosed hitherto in the annals of crime in this country—facts which nothing but the clearest evidence could compel us to believe. The leading feature of this singular case is the existence of an order, or band of men, having its head in Ireland, extending into the United States and spread by ramifications throughout the coal regions of Pennsylvania, each minor division governed by a body-master of its own locality, to whom the secret passwords, signs and tokens of recognition, called "goods," are transmitted through a descending grade of officers from the head of the order to the body-master, and by them distributed to the members. When we are informed that these men traded in blood, taking life for life by compact, burned houses, mills, breakers and valuable structures at the instance of each other, and banded together, by means of concealment, money and perjury, to shield each other from punishment, our incredulity is so excited we would fail to believe the tale from the mere mouths of two or three witnesses ; and nothing less than facts clearly and fully proved could command our belief. These the Commonwealth undertook to prove, and strange as it may seem, proved beyond the possibility of a doubt.

The chief witnesses by whom the organization called the " Ancient Order of Hibernians," but more commonly known as the "Molly Maguires," was shown to exist, and its purposes, practices, passwords and signs, were James Kerrigan, a member of the order, and a party to the killing of one John P. Jones in return for the killing of Benjamin F. Yost, and James McParlan, a detective, who procured himself to be admitted a member of the order for the purpose of obtaining its secrets and frustrating its designs. Standing alone, the testimony of Kerrigan would be worthless, and even McParlan's, without confirmation, would be weak and perhaps unconvincing. Hence, the Commonwealth felt the necessity of sustaining the narratives of these witnesses by a long array of circumstances, beginning before the murder of Yost and running down to the subsequent killing of Jones by way of return. These circumstances constituted

[Carroll v. Commonwealth.]

a chain of evidence, branching out for the proof of two distinct, yet completely connected matters. One, primarily, for the identification of the prisoners, McGehan and Boyle, by whom the murder of Yost was committed ; the other, secondarily, for the proof of the causes and motives for the commission of the act, and the privity of Carroll and Roarity as accessories before the fact, and liable, therefore, as principals, under the 180th section of the Criminal Code of March 31st 1860, and 44th section of the Criminal Procedure Act. The chain of circumstances was, therefore, double, having a twofold relation to the case, which made the occurrences after the murder, competent evidence. The facts which proved the existence, purposes and practices of the order known as the " Molly Maguires," as the means of exhibiting the causes and motives leading to the murder of Yost, and the participation of Carroll and Roarity with McGehan and Boyle, in the execution of the deed, were not necessarily all antecedent. Some were, others were not, but by confessions and direct links were traceable to those having a prior existence. Hence the evidence of these subsequent events, while having no direct bearing on the identification of McGehan and Boyle as the actual perpetrators of the murder, had a strong and pertinent bearing upon the causes and motives operating upon them in the perpetration of the crime, and upon the connection of Carroll and Roarity with them, as participants in their guilt.

Thus the entire body of the evidence became necessary to show the conspiracy which linked all the prisoners together, to show that they were combined in the most intimate relations, and in a common purpose, that their subsequent conduct and confessions were thereby connected and made competent against each other, and that all these combinations and purposes led directly to the commission of another murder, that of Jones, as the return price of the killing of Yost, which became linked to each other, as a part of the evidence exhibiting the nature and effect of the combination leading to the killing of Yost. The whole network of the evidence is so complicated, and so clearly united and connected together in proving the guilt of all the prisoners, and their motives and the agencies employed, it is not possible to strike out the subsequent facts without destroying to a great extent the unity and relevancy of those which preceded the act. McParlan's testimony strongly corroborates Kerrigan's, and both are sustained and supported by other witnesses as to facts, before, at the time of, and after the murder.

When these two purposes of the testimony are borne in mind we see clearly that the objections to the evidence constituting the second and third errors, and fourth to the ninth inclusive, are without weight. We must look at the real competency of the evidence and not at the order of its reception ; and when we find that it was all finally competent, we will not reverse, because of the time or order of its introduction. In this connection we may notice that part of

[Carroll *v.* Commonwealth.]

the offer set out in the second assignment of error, in which it is stated that the murder of Yost was to be the price or consideration of the murder of John P. Jones. Now, though when the murder of Yost was undertaken, that of John P. Jones was not then stated or understood to be the consideration for it, yet it became an important fact in the disclosure of the purposes and practices of those who participated in the murder of Yost, and of the nature and customs of the order to which they belonged, which made the murder of Jones a return compensation for the murder of Yost. The evidence under that offer was therefore properly retained in the case, and the court committed no error in refusing to strike it out.

The relevancy of the evidence set out in the assignments of error down to the 16th, is made manifest by what has been said. The evidence is not simply corroborative of the testimony of Kerrigan, it is to a large extent confirmatory and independent, lending strength to those parts which in themselves tend to establish the guilt of the prisoners. This case is well illustrated by Æsop's fable of the bundle of rods. One by one each stick may be taken away and easily broken, but the united fagot resists the strength that would destroy it.

The evidence being properly before the jury we cannot perceive that the court committed error in charging upon it.

> The sentence of the Court of Oyer and Terminer is therefore affirmed, and the record is ordered to be remitted for execution of the sentence according to law.