## Commonwealth v. Rasefske et al.

*Warren S. Burchinal,* district attorney, for Commonwealth.

*Patsy V. Marino,* for defendants.

CUMMINS, J., October 12, 1931.—The defendants, fourteen in number, were indicted upon the charges of (1) conspiracy, (2) unlawful assembly and (3) riot, in as many counts. Three of them, Turk, Savor and Zigon, pleaded guilty. The others were tried and all but one found guilty, eleven of them as indicted, and one, Anna Rasefske, of unlawful assembly. Their motions for a new trial and in arrest of judgment are now before the court in banc. In support thereof they contend in their original motion for a new trial, (1) that the verdicts were against the law, (2) the evidence, (3) the weight of

the evidence, and (4) the charge of the court, (5) that the court erred in its charge to the jury, without specifying any error therein, (6) that the court's charge was against the evidence, without specifying in what particular; in their brief filed in connection with their oral argument, (7) that the court erred in permitting testimony showing the National Miners Union to be a communistically controlled organization; and, by additional reasons filed after argument court with the court's permission, alleged (8) that the court erred in admitting in evidence a photograph of the defendant, Leo Thompson, while raised upon the shoulders of two of his fellow-marchers, in which position the Commonwealth claims he gave the order to begin the riot, in 9 to 22, that the court erred in ruling on testimony, and in 23, that the court erred in not withdrawing a juror and continuing the case by reason of an article appearing in a newspaper during the progress of the trial.

The evidence was, of course, in some respects in conflict, but there was ample testimony from which the jury could fairly have found the following to have been the facts. In our mining district there exist two mining labor organizations, the United Mine Workers of America and the National Miners Union. The first is nonpolitical, a pure labor organization; the latter, a dual organization, a communistic labor organization, i. e., a labor organization dominated, controlled and directed by communistic leaders, having as its ostensible object the betterment of labor conditions, but apparently as its ultimate aim the spread of communism by the absorption and control of existing labor organizations and their use as a means for fomenting class strife, class warfare and the eventual establishment of a communistic state; all of which was not only material, but very material in establishing the fact that these were rival organizations diametrically opposed to each other.

The United Mine Workers of America secured from the Borough of Canonsburg, this county, its athletic field, Curry Field, in order that they might hold there, on July 19th last, an open meeting, at which meeting the leading officials of that organization were to speak. To this meeting, by handbills and posters, were invited "Every Loyal United Mine Worker" and their "Friends." At the appointed time, from the mining districts around, came many hundreds to this meeting. A speakers' platform decorated with American flags had been provided, together with amplifiers and loudspeakers. The speakers mounted the platform, and with the Chief Burgess of the Borough of Canonsburg acting as chairman, the meeting began.

The leaders of the National Miners Union, learning of this meeting, had summoned the members of their organization to meet that morning at Beck's Field, about a half mile distant from Curry Field, and many hundreds of them there assembled. Here the National Miners were harangued by the defendants, Leo Thompson, Stella Rasefske and by four or five other speakers. The identity of the persons who called this meeting, the names of the speakers other than those given and the name of the chairman at this assembly, those of the defendants who testified professed not to know. In these speeches, those there assembled were told of the United Mine Workers' meeting; that their leader, Fagan (the President of the United Mine Workers of America of this district), had sold them out, and they were asked if they were going to stand for it, with cries from the assembly of "No! No!" After much speaking, those there assembled were told that they were going to march down to Curry Field, drag Fagan from the speakers' stand and beat him up or kill him and throw him into the creek. This assembly then, forming into marching array and many hundreds strong, began its march upon Curry Field. Leading it were Leo Thompson, who boastingly testified that he was a communist, and Stella Rasefske, two of the defend-

ants. At the head of this marching column was carried a banner on which was inscribed "Down With the United Mine Workers of America."

Arriving at Curry Field, these National Miners, armed with stones, bottles and clubs, in perfect marching array, advanced in front of the speakers' stand. Fagan was at the time speaking. When they arrived at the speakers' platform, the women and children moved to either side. Shortly after this, Leo Thompson, who was obviously in charge of that march, was raised to the shoulders of two of his fellow members, and while thus held aloft, with a megaphone in hand, he cried to his followers: "Comrades! Comrades! Let's go and get him." No sooner had he thus spoken than he threw at the speakers' platform his megaphone, and the mob, surging forward, attacked with great uproar and clamor the speaker and others on the speakers' stand, throwing bricks, stones, bottles and other missiles. The chief burgess was driven from the speakers' platform. Fagan, who was at the time speaking, was knocked down, dragged from the platform and left lying unconscious down close by the creek bank. Every one on the platform was driven off. The amplifiers were torn down, and also the American flags, and one of the latter was thrown down and trampled upon. This all was effected violently and tumultuously, and to the great terror of the people there assembled.

The speakers' platform cleared and surrounded by his followers, Leo Thompson then mounted it and started to harangue his followers. At this juncture the state police were seen riding upon the field. Thompson immediately gave commands to his followers. Quickly they re-formed their ranks and marched from Curry Field back to Beck's Field; and from there dispersed.

As already observed, many of these alleged facts were denied, but there was ample evidence from which these could have been found by the jury to have been the facts, so that it could not be said that the verdict was against the evidence or the weight of the evidence, which are the second and third reasons assigned in support of the defendants' motions.

The first and fourth reasons assigned in support of defendants' motions are that the verdicts rendered were against the law and the charge of the court. To mutually assent to commit acts which, if executed, would make them rioters would constitute conspiracy. In fact, where two or more persons agree or reciprocally assent to do an unlawful act or to do a lawful act by unlawful means, they are conspirators: Wilson et al. *v.* Com., 96 Pa. 56; Com. *v.* Brown, 23 Pa. Superior Ct. 470; Com. *v.* Stambaugh, 22 Pa. Superior Ct. 386, 389. Nor need one have been one of the original conspirators; others may join in it. In fact, each new accession would constitute the conspiracy a new one: Com. *v.* Bartilson, 85 Pa. 482; and so each overt act done in furtherance of the object of a conspiracy constitutes the making of a new conspiracy: Com. *v.* Bartilson, supra; Com. *v.* Tack, 1 Brewster 511; Com. *v.* Westervelt, 11 Phila. 461.

The acts agreed to be committed by these marchers clearly do not come within the scope of our acts of assembly making no longer punishable criminally labor agreements entered into having for their object the prevention of persons from going to work without the use of force, threats or menace of harm to person or property (see Act of June 14, 1872, P. L. 1175; Act of April 20, 1876, P. L. 45; Newman *v.* Com., 7 Sadler 127, 132; Act of June 16, 1891, P. L. 300; Jefferson & Indiana Coal Co. *v.* Marks et al., 287 Pa. 171); for here the object sought to be accomplished was not to prevent persons from going to work, but at most to violently disperse a rival labor organization.

While it is true that a conspiracy to commit a felony will merge with the felony, a like result does not follow where the conspiracy is to commit a misdemeanor, a riot being such: Com. v. McGowan et al., 2 Pars. Eq. Cas. 341, 351. The commonly accepted definition of an unlawful assembly is where three or more assemble upon a purpose which, if executed, would make them rioters. And the violent and tumultuous dispersal of a lawful meeting by force and violence, to the terror of the people, amounts to riot: Com. v. Daley, 4 Pa. L. J. 150, 153. In the authority last cited, a case in some respects quite similar to the one now before us, King, P. J., remarked: "If the call of the meeting . . . . was addressed exclusively to persons favorable to its objects, the interference of individuals hostile to its proceedings and the breaking up and dispersing of the meeting by them was a gross outrage on the rights of those who called it. It was a riot of a flagrant kind." Clearly the verdicts rendered were not against the law or the charge of the court.

The fifth reason assigned, "that the court erred in its charge to the jury," without specifying any error therein, is without merit and cannot be considered: County Court Rule No. 24; 46 C. J. 338, Sec. 341. Nor can the sixth reason, alleging that the court's charge was against the evidence, without specifying in what particular, be sustained: Lyons v. Pittsburgh Rys. Co., 301 Pa. 499, 502. Upon oral argument, no complaint was made as to the court's charge. None of the first six reasons assigned were pressed, the only reasons orally argued or covered by the defendants' brief being the eighth and twenty-third.

The eighth, eleventh, twelfth and twentieth reasons assigned in support of defendants' motions complain of the court's rulings on testimony in permitting the Commonwealth to develop by cross-examination the fact that certain of the defendants were members of the National Miners Union, which union had staged the riot, and that the National Miners Union is a communistic organization, i. e., a communistically directed and controlled organization; and, hence, a rival organization diametrically opposed to the United Mine Workers of America, proof of which disclosed the motive for the attack. As these several assignments raise but substantially one question, they are considered together. The objection earnestly and ably advanced by defendants' counsel is that proof of these facts tended to create prejudice. To permit proof of irrelevant facts which would merely tend to create prejudice would undoubtedly be erroneous, but not the admission of relevant facts, although prejudicial to the accused. And so, in Carroll v. Com., 84 Pa. 107, Hester v. Com., 85 Pa. 139, and McManus v. Com., 91 Pa. 57, the Commonwealth was permitted to show that the defendants were members of the "Mollie Maguires," and in Com. v. Fragassa, 278 Pa. 1, and Com. v. Daniele, 278 Pa. 7, that the defendants were members of the "Black Hand Society" or "Mafia," because it tended to show the motive for and explain the killings involved. And see Com. v. Fasci, 287 Pa. 1, 3, and Com. v. Biddle (No. 2), 200 Pa. 647, 648. It must be borne in mind that the Commonwealth not only made inquiry about the National Miners Union being connected with communism, but actually developed facts from which it could be reasonably inferred that it was a communistically controlled and directed organization. Thompson, organizer and leader of the National Miners Union in this section, admitted that he was a communist; that affiliated with the National Miners Union is the "Youth Section," and with the Communist Party, the "Young Communist League;" that the members of these several organizations called one another "comrades." Asked as to the meaning of "reliable comrade in charge" (of a local National Miners Union)—"Don't you mean 'comrade' as you refer to your communis-

tic comrades," he replied, "No, not necessarily. It may be." In his memoranda book found on his person at the time of his arrest, and indiscriminately on the same page, is data referring both to "Youth Section" and the "Young Communist League." Asked, "Your 'Youth Section,' your 'Youth Communist League,' and your interest in the National Miners League Union is all one and the same thing, isn't it?" he answered: "Not necessarily." Asked as to the National Miners Union, "and the leaders of it are you and your comrades, aren't they?" he replied: "There is no question about it—that many of the members of the National Miners Union are communists." In his notebook used in connection with his National Miners Union work is written "Prove that Communists are the best fighters for immediate demands;" and asked if this meant "demands of the National Miners Union," he replied, "Absolutely." Asked if it was not a part of his work as an organizer of the communistic outfit to organize these (members of the National Miners Union) into communists, he replied, "Not necessarily." Asked "You are engaged as an organizer for the communist movement in welding together the National Miners, your Youth Section, your Young Communist League and all as the communist movement, aren't you?" he replied: "Yes; it is true that communism will eventually solve all problems of the working class." Again asked: "Are the persons in charge of it [The Trade Union Unity League, of which the National Miners Union is a branch] so affiliated [with the communist movement]?" he replied, "Not all of them." Mary Rasefske, a defense witness, having testified that she was a member of the "Youth Section," was properly asked on cross-examination: "But [at] these miners' meetings Youth Section and communism is the subject of the meeting, isn't it?" to which she replied, "Not always." From these and other admissions made by the defendants and their witnesses, it could without any difficulty be reasonably inferred that the National Miners Union is a communistic organization, i. e., an organization directed and controlled by communists, with the ultimate aim of the spread of communism; and hence a rival organization of the United Mine Workers of America, a purely labor organization with no aim except to aid labor conditions. The fact that there are noncommunistic members in the National Miners Union is beside the question; the fact of leadership is the controlling factor. It is not doubted that Russia is a communistic state, although but a small part of her citizens are communists; but the leaders, those in control, are. From one of Thompson's admissions it is quite apparent that while the ostensible aim of the leaders of the National Miners Union may be to better the workers' conditions, their ultimate or real aim is the establishment of communism; that these organizations are being used by them only as a means to an end. The material and relevant fact involved is that these organizations are rival organizations with purposes wholly at odds with each other, and not the merits or demerits of their respective purposes or their manner or means of functioning. Counsel for the defense, frankly recognizing the fact that this evidence warranted these inferences, asked the defendant Thompson: "What is the function of the Communist Party?" for the purpose of showing that its purposes are not illegal. The Commonwealth's objection to this question was properly sustained, the court holding that the material fact involved was the fact that they were rival organizations with entirely different aims, and not the merits or demerits of the aims of either. This is the ruling complained of in the twenty-first reason assigned in support of defendants' motion.

By the eighth and twenty-second reasons assigned, the defense complains of the court's ruling in admitting in evidence Exhibits "B" and "F," the former a photograph purporting to show the defendant Thompson raised upon

the shoulders of two of his followers, with megaphone in hand, in which position it was claimed he gave the order that started the riot, and Exhibit "F" purporting to show the National Miners marching upon Curry Field just before the riot began. It having been testified that these photographs were true likenesses or fair representations of what they purported to portray, the same were properly admitted: Com. *v.* Connors, 156 Pa. 147; Com. *v.* Swartz, 40 Pa. Superior Ct. 370; Thompson *v.* De Long, 267 Pa. 212, 218; Com. *v.* Luccitti, 295 Pa. 190, 199; Marcinkiewicz *v.* Kutawich, 87 Pa. Superior Ct. 260, 262. Who the photographer was who took the pictures of this riot while actually in progress was not disclosed by the testimony, the only fact indicating who the artist might have been being the fact that a number of them appeared in the public press, some of which latter prints were offered in evidence by the defense, using the same method of proof as that used by the Commonwealth in placing in evidence Exhibits "B" and "F."

The ninth reason assigned is without merit. The defendant, Anna Rasefske, having admitted that she was present with the National Miners at Curry Field at the time of the riot, cross-examination as to her prior activities in the organization, which matter is complained of in the tenth reason assigned, was entirely proper: Com. *v.* Fasci, 287 Pa. 1, 3.

The fourteenth, fifteenth, sixteenth, seventeenth and eighteenth reasons assigned, relating to the testimony of the defendant Thompson, are so closely connected that, for the purposes of discussion, they can no more be separated than the riot involved could be separated into separate, distinct combats or fights. To fairly consider them, they must be not only considered together but in connection with practically the entire testimony of this defendant. Generally, he declined to give his testimony by question and answer, but insisted upon giving it in a narrative form, disregarding often questions asked and thereby depriving the Commonwealth of the opportunity to object to volunteered irrelevant and incompetent matter. Especially was this true in those parts of his testimony dealing with the speeches delivered by him at Beck's Field and later at Curry Field; these speeches he insisted upon giving in narrative form, that is, giving the substance of the speeches themselves. Evidently he may and did say many things in these speeches which would be wholly foreign to the issues being tried. To this form of testimony (not the substance) many objections were made by the Commonwealth; the court insisted on the witness giving his testimony in form of question and answer; and after the court's ruling in this matter, defendant's counsel endeavored to have his client so proceed, but despite the district attorney's objections, defendant's counsel's endeavors and the court's rulings, the witness continued to disregard these restraints. The defense was permitted to show everything said in these speeches which might be relevant and more. The court's ruling against the defendant was to his giving such testimony in narrative form, counsel for defendant having declined, after request by the court, to make an offer giving the details of the speech sought to be proven. The court also sustained objections to the witness's testimony where he sought to give in evidence the words of abuse which he had heaped upon the leaders of the rival organization and telling what other people thought of them. With reference to this, the court appealed to defendant's counsel, with the result of his informing the court: "I have cautioned him against that time and time again." An examination of his entire testimony will show that he was not prevented from giving any relevant testimony. The claim that the court's rulings, requests and complaints in insisting on the witness's testifying by question and answer were prejudicial to this defendant is, we believe, without

210

merit. We are convinced that no such result followed from the court's rulings; and if at all, only from the witness's own refusal to follow such rulings. No complaint was made upon trial of the court's comments in making these rulings, no motion to withdraw a juror on account thereof was made, nor were any exceptions taken to such comments in making such rulings, but only to the court's rulings themselves. After careful consideration of all of these reasons so assigned and after carefully reading several times the testimony of this witness, we are convinced that none of them should be sustained.

In the nineteenth reason assigned, complaint is made that "the court erred in overruling objection . . . to admission of testimony as to different ages. . . ." We quote from the portion of the record involved. "Q. How old do you say you are? A. Nineteen years old. Q. Now, when you were committed to jail . . . you gave your age as twenty-three, didn't you? A. Yes. Q. Why? A. Because . . . ever since I had to work I had to exaggerate my age in order to get a job. Q. . . . So you had to exaggerate your age in order to be committed to jail?" Objected to by defendant's counsel, which objection was overruled by the court. The court's overruling this objection is the matter of complaint. This cross-examination was clearly proper, but the question was never answered, so that even if the court's ruling were erroneous, it would be a harmless error: Rubinsky v. Kosh, 301 Pa. 35, 37.

The twenty-third and remaining reason assigned complains of the court's ruling refusing defendants' motion to withdraw a juror and continue the case on account of a newspaper article appearing in the public press during the progress of the trial. This article, whether it may or may not have been seen by any of the jurors, was not such as one would reasonably believe would affect the verdicts, and was not, therefore, ground for the withdrawal of a juror: 46 C. J. 139, Sec. 96. After a careful review of the entire record, we fail to find therein any error which would call for a retrial. The defendants were, in our opinion, fairly tried and convicted. Any other verdict would have been a travesty on justice.

And now, October 12, 1931, motions for new trial and in arrest of judgment refused.

From Harry D. Hamilton, Washington, Pa.