## McManus *versus* Commonwealth.

1. In an indictment for murder, the fact that the prisoner was a "Mollie Maguire," and the character and purpose of that organization, are competent evidence to show motive for the commission of the murder, and to explain the relations existing between a witness and the prisoner, and why certain admissions and declarations of the latter were made. Hester *v.* Commonwealth, 4 Norris 139; Carroll et al. *v.* Commonwealth, 3 Id. 107, and Campbell *v.* Commonwealth, Id. 187, followed.

2. The refusal to grant a new trial is a matter of discretion and not reviewable.

June 11th 1879. Before SHARSWOOD, C. J., GORDON, PAXSON, TRUNKEY and STERRETT, JJ. MERCUR and WOODWARD, JJ., absent.

Error to the Oyer and Terminer of *Northumberland county:* Of May Term 1879, No. 42.

Indictment of Peter McManus for the murder of Frederick Hesser. McManus was jointly indicted with John O'Neil, but they were granted separate trials.

Frederick Hesser, the deceased, lived in Coal township, Northumberland county, about two miles from the borough of Shamokin. He was a stout, fleshy and healthy man, fifty-seven years old. In the month of December 1874 he was employed in the capacity of night watchman, at what is called the Hickory Swamp coal breaker, about one mile from his residence. He was in the habit of going to his work about six o'clock in the evening, and returning about seven o'clock in the morning. On the 18th of December 1874 he was alive and in good health. About six o'clock in the evening of that day he left his home, and was last seen on his way to his place of employment. The next morning, at about six o'clock, whilst it was yet dark, his dead body was found, lying upon the floor near the stove, in the engine-house of the breaker, partly on his face and shoulder. He wore a black soldier overcoat, the cape of which partly covered his head. A club three and a half to four feet long was found near him and partly under the stove; a hammer that had been used at the breaker was found by his right hip. Both these instruments had blood and hair on them. There was a dinge upon the clock which hung against the wall or post, the face of which was injured, and the glass broken and strewn over the floor. The lower hinge of the door that led into the room was broken, and there were marks upon it. An examination of the body showed eight wounds in the scalp, apparently produced by some blunt instrument, and a fracture of the right forearm.

At the time of the alleged murder the prisoner lived with Henry Long, about a mile from Hickory Swamp Colliery. On the evening previous to the murder the prisoner was at home at Long's house. One John O'Neil came there while McManus, the prisoner, was

there on that Thursday night. One Robert Haggerty and a stranger were with O'Neil when he came. They remained there during the night. When they arrived the prisoner was in bed and they called him up, and they went down stairs. They were together down stairs in the kitchen. Robert Haggerty went home before morning. In the morning the prisoner, O'Neil and the stranger were seen coming down stairs. O'Neil and the stranger went away, McManus, the prisoner, accompanying them for some distance. He returned, and some time after took his gun and dog and told the family he was going hunting, and if any person asked for him, to say that they did not know how soon he would return. He returned late in the day, went up to his room and went to bed about eight or nine o'clock. He was there in the morning. The theory of the Commonwealth was, that on Thursday night, the night before Hesser was killed, the alleged murder was planned by the prisoner and the persons with him at Long's house.

At the trial before Rockefeller, P. J., Morgan P. Davis, a witness for the Commonwealth, in substance, testified to two different conversations that he heard between the prisoner at the bar and John O'Neil, and also a conversation between himself and the prisoner. The conversation between the prisoner and O'Neil took place at the mines at Hickory Ridge Colliery, in the month of May or June 1876. The witness said that at the time he heard the first conversation between the prisoner and O'Neil, "that McManus came out from his shutes and headings. This was in the gangway, and asked me if I had seen Jack O'Neil, and I said I had, he was up in his breast. So McManus jumped right on to the ladder, as we call it, that we had to go up. McManus went up the breast forty-five or fifty yards and seen O'Neil. I went up to my own place. I had two shutes, and I went up the inside shute, the next but one to O'Neil's. When I went up I creeped over through the pillars until I got in the next pillar of the inside shute where O'Neil was working. There I heard a conversation in regard to this Hesser case. Jack O'Neil said to Peter McManus, I was awful afraid last night, hearing that the coal and iron police was around after the Mollies. I was awful afraid I would be taken for the Hesser murder case. McManus said, no danger, never fear, Jack. O'Neil said, some of the rest of them may squeal. Then McManus says, no danger Jack, repeating it. If you are taken, die grit, like a goat, and I will do the same. Then McManus talked to him again, and told him, never fear, again. Then Jack said, look how little Kerrigan squealed [referring to the evidence of Kerrigan in Campbell *v.* Commonwealth, 3 Norris 187 REP.]. Then McManus said to Jack O'Neil, Michael J. Doyle and Edward Kelley were damned fools for shooting John P. Jones in open daylight. If they had taken the dead hour of the night at it, like we did; and

it was the deathly blow I give old Hesser on the side of the head what fetched him. Then they moved over a little distance to the outside shute. Then O'Neil says, I am very sorry for it. Then Peter McManus says, I ain't a God damned bit; it would be death if we didn't do it, and before I would violate my oath I would die and do it again; and it wouldn't be no worse anyway. That was all I heard at that time." The witness stated that he heard another conversation between O'Neil and Peter McManus and another person, in reference to this Hesser murder. "That was a few days afterwards, in Hickory Ridge Colliery, in the mines, just above the battery, what we call the stoppings for ventilation, to turn it up. They were about eight yards from the gangway. O'Neil, McManus and Pickey Donnelly were together. O'Neil said, I wonder if them fellows that passed us heard our conversation when we were planning the Hesser murder case? we were rather full, and talked rather loud. McManus said to Jack O'Neil, keep quiet, mouth shut; it is all dark only to our own party. I wasn't more than about twelve feet from them." The witness then related a conversation between himself and the prisoner. "Him and me was going to work in the morning; we were going from Henry Long's to Hickory Ridge Colliery; only us two were together. He asked me what was the news in the "Shenandoah Herald" last night. I said that Tom Foster is hunting up those things fast, those Mollie Maguire cases; and the murderers of Hesser ain't very far from here, I said to him. Then he got excited in a minute, and asked me what did I know about it, and I told him he need not get mad, I was only telling him what was in the paper. He told me to keep my God damn mouth shut. I kept my mouth shut; I said no more."

The Commonwealth offered to prove by a witness upon the stand, Dennis F. Canning, that at the time of the murder of Frederick Hesser, and for some time prior thereto, there existed in the coal regions of Northumberland and Schuylkill counties an organization known generally as the Mollie Maguires, but the real name of which was the "Ancient Order of Hibernians," that he was initiated as a member of that organization, and was at the time Hesser was murdered, county delegate of such organization for Northumberland county, and that McManus, the prisoner, whose declarations and admissions, witness has testified to, and whose conversations and acknowledgments had with and made to one John O'Neil, the person jointly indicted with said McManus, as testified to by Morgan P. Davis, was a member and body-master of such organization at the time of and prior to the murder, and was such at the time when such admissions and conversations were made and had; and that said John O'Neil, at the time and prior to the murder, and at the time of said conversations and admissions, was a member of said organization; and that both were known to be such by the witness;

[McManus *v.* Commonwealth.]

and that McManus the prisoner, knew witness to be a member and officer of said organization at the times spoken of; that it was the practice in the said organization, and known to be such to the above-named persons, for the members to aid and assist each other in the commission of crimes, and in defeating detection and punishment. That said organization was a secret one, whose members were bound by oaths or obligations to secrecy; the members of which could make themselves known to each other by signs and pass-words; and that the declarations and admissions of the prisoner, above referred to, were made to the witness, and the conversations and declarations had with and made to John O'Neil were made and had as a fellow-member of said organization. This to be followed by proof that McManus, the prisoner, said John O'Neil and another member of said organization, who called himself Pat O'Neil, met the night before said murder in the neighborhood where the crime was committed, and in a conversation together spoke of beating some one's brains out; and that said Pat O'Neil had upon his person papers showing him to be a member of said organization, which he destroyed, under instructions of said prisoner, for fear he would be arrested with them on his person, and that he left the county immediately after the commission of said crime, by direction of said prisoner.

This for the purpose: 1st. To show the motive for the commission of the murder; and 2d. To explain the relations existing between the witness, the prisoner and said John O'Neil, and why the admissions, declarations and conversations above referred to and already in evidence were made and had.

The defendant objected:

1. Because the prisoner cannot be called upon to answer to that of which he had no notice. The indictment on which he was arraigned, and to which he has pleaded not guilty, charges that Peter McManus, yeoman, wilfully and of his malice aforethought did kill and murder one Frederick Hesser. It does not charge that the prisoner was a member of any secret or open society or organization, or that he conspired, contrived or colluded, with the members of any secret or open society or organization to commit the crime charged in the indictment; nor that he was counselled, directed or commanded by any society or organization having authority over him, to commit the crime of which he stands charged. The prisoner is without notice through the indictment or otherwise that he would be called to defend himself against such charges and allegations as are contained in the Commonwealth's offer. It is a fundamental rule of criminal law that a prisoner can only be called on to answer and defend that with which he is directly charged in the indictment preferred against him.

2. The prisoner is indicted for murder and not for conspiracy. The offer is to show that he was connected with a secret

[McManus v. Commonwealth.]

organization, engaged in and counselling criminal practices. It is not competent to show that he was connected with such secret organization. Nor can he be called upon to defend an implied charge of conspiracy; such charge must be directly made and set out in the indictment, before a prisoner can be required to answer.

3. The offer of the Commonwealth is to show that there existed in Northumberland county, and in other counties of this Commonwealth, a secret society, criminal in its purposes and practices, and counselling, permitting or commanding its members to criminal acts, and protecting and defending them against arrest and punishment, and that the prisoner was a member of such society or organization. The only effect of the evidence proposed by the offer, would be to show the character of the prisoner, by inferences drawn from his membership with such criminal society. The character of the prisoner cannot be attacked by the Commonwealth; the prisoner alone may deal with that question, in the first instance by availing himself of his good character as a circumstance of defence; and not until this is done by the prisoner can the Commonwealth enter upon the question of character by direct inquiry, or by indirect means tending to that purpose.

4. The offer is to show the existence of a criminal society in Northumberland county, and the criminal acts of parties not on their trial here, nor indicted with the prisoner, and for whose acts the prisoner is not responsible.

5. It does not appear, from the evidence, that the alleged criminal organization or society, of which the prisoner is charged with being a member, had any agency in the indictment to which the prisoner is answering.

6. Evidence must be confined to the issue in the case, and in this case the proofs do not show the defendant acted otherwise than on his own responsibility, or that he acted by direction of, or in collusion with, any society, or person or persons.

7. The opportunity and means for committing the crime, and the motive for it, must be shown by legal evidence.

8. The evidence offered is not competent.

9. The evidence offered is irrelevant to the issue trying between the Commonwealth and the prisoner.

Objected to as to the purpose of the offer.

1. The opportunity, means and motive ought to be proved from the facts connected with the perpetration of a crime, by the weapons employed in committing it, and the time where committed, and nothing contained in the offer tends to this purpose.

2. Relations existing between the witness, the prisoner and said John O'Neil, and why the prisoner made certain declarations and admissions, charged to have been made by him, are not proper subjects of inquiry for the purpose of this trial, nor can such relations be shown by proof of the prisoner's responsibility and rela

tions to, or membership in, a secret society, and therefore such evidence is not revelant.

By the court: "The question raised by the offer to prove the existence of the society called the 'Ancient Order of Hibernians,' known as 'Mollie Maguires,' and its objects and operations, is not a new one, and has been before the Supreme Court in several cases. It is true it was offered to prove that the crimes were committed through the instrumentality of the 'Mollie Maguire' organization, but in the case of Hester et al. *v.* Commonwealth, 4 Norris 139, counsel made the objection that the testimony showed that the society in question had no agency in the alleged conspiracy, but that the prisoners acted on their own individual responsibility; that evidence, therefore, as to the nature of the society and the relations prisoners sustained to it, was incompetent and irrelevant. The court below admitted the evidence, confining it to facts that existed in October 1868, and declined to admit proof of specific acts of other members of the society, either before or since that time. This was affirmed by the Supreme Court. Judge Woodward, in delivering the opinion of the court, says: 'Was this testimony relevant? It was not designed to be used to establish the commission of any independent crime, nor was its object to affect general character or to repel inferences from adversary facts. Its purpose was to *explain the relations existing* between the conspirators. The' reason, motive and opportunity of their combined action and the nature of the tie that bound them together.' In that case, ten men, including the three prisoners, met in a saloon on the evening of the 16th of October 1868, and openly arranged the details of their plan to attack and· rob Mr. Rea on the following day. Hester was the body-master of the Locust Gap division, and the nine others were members of the order. A motive, that is to rob and obtain money, had been proved, and there was no real necessity for proving any other motive; but the evidence was proper, in my opinion, for the purpose of explaining the relations that existed between the conspirators, the reason and opportunity of their combined action, and the tie that bound them together. In the present case, the Commonwealth relies on the confessions, or rather what may be more properly termed, the self-criminating statements of the prisoner, in connection with circumstances and facts tending to show that they were true, made to the witness and also to one or more of the alleged conspirators, at a time when they thought no one was present. It is proposed to prove that the prisoner was the body-master of Shamokin division at that time, and John O'Neil was a member of the society. That the witness was county delegate of the same order at the time, and that the declarations and admissions of the prisoner referred to, were made to the witness, and the declarations had with and made to· John O'Neil,

[McManus v. Commonwealth.]

were made and had as a fellow-member of said organization. This being in the offer, I do not see how the evidence can be rejected. The evidence already in, clearly tends to show that both the prisoner and O'Neil were some of the parties connected with the murder of Hesser. On the occasion when Pickey Donnelly was present, it would seem plain that they talked of a previous planning of the Hesser murder. O'Neil expressed his fear that some persons who had passed, the night they had planned the Hesser murder, had heard them, as they had talked rather loud, when McManus told him to keep quiet, that it was all dark only to their own party. This evidence, if believed, clearly tends to show that there had been a previous conspiracy, a planning of the Hesser murder, and that these parties were the conspirators. If the kind of testimony received in the case of Hester, was proper to explain the relations, reason and motive, and opportunity of combined action, and the nature of the tie that bound them together; that is, ten men who had conspired to murder Rea, why is it not proper to show the relations, &c., of two or more men who had done the same thing with regard to the murder of Hesser ? The statement of the conversation between the prisoner and O'Neil, as detailed by Morgan P. Davis, tends to show that they were talking together as members of the society. McManus was the body-master and O'Neil a member. O'Neil expressed his fear of being taken for the Hesser murder, as the police were up after the Mollies, and the reply of McManus tends to show that they were acting under some secret oath or obligation. It is not shown that the object was to rob Hesser, and without some evidence of the kind offered, the act is perfectly inexplicable. With it, perhaps, the declaration and evidence already in, may be understood. The Commonwealth cannot expect to convict the prisoner, on his own confessions and declarations alone, and must show some facts or circumstances independent of them, tending to show that they were true. I have come to the conclusion to admit the evidence, confining the testimony to facts that existed in the month of December 1874, at the alleged time of the Hesser murder, but it is not permitted to prove specific acts of others, members of the society, either before or since that time. All specific acts of others than those charged with complicity in the murder of Hesser, are excluded."

The defendant, inter alia, presented the following points, to which are appended the answers of the court :

3. That the evidence in this case discloses and proves that Peter McManus, the defendant, was not present when Frederick Hesser was killed, nor did he inflict the injuries which caused the death of Frederick Hesser. That unless the Commonwealth have established by sufficient competent evidence, that Peter McManus counselled, advised, conspired, aided and abetted or procured

[McManus *v.* Commonwealth.]

the killing of Frederick Hesser, he, Peter McManus, must be acquitted.

Ans. " I cannot answer this point as requested, but so much of the point as requests the court to charge that unless the Commonwealth has established, by sufficient competent evidence, that Peter McManus counselled, advised, conspired, aided and abetted or procured the killing of Frederick Hesser, he, Peter McManus, must be acquitted, is affirmed."

4. That there is no evidence in this case tending to show that Peter McManus was connected with or had anything to do with the killing of Frederick Hesser, except the evidence of Morgan P. Davis, and that all the other evidence in the case, is consistent with the innocence of the defendant.

Ans. " This point I answer as requested, but say, to you, that in my opinion, there is evidence in the case, tending to show that Peter McManus was connected with or had something to do with the killing of Frederick Hesser, taken in connection with the evidence of Morgan P. Davis; but without the evidence of said Davis, all the other evidence is consistent with the innocence of the prisoner, and the point is answered in the affirmative."

In the general charge the court, inter alia, said :

" No witnesses have testified that they saw the act done, and the individual who committed it, but the Commonwealth relies partly on facts and circumstances sworn to by several witnesses, and on the declarations, admissions or statements of the prisoner himself, made on several occasions. * * *

" The defendant's counsel contend that there is no evidence, or not sufficient evidence in the case to be submitted to the jury, tending to show the defendant's participation in the alleged crime, and that the court ought to instruct you, as matter of law, that there can be no conviction; but I am of opinion that there is evidence in the case which I am bound to submit to you."

The jury rendered a verdict of murder in the first degree, and the prisoner was sentenced to be hung. A like verdict was recorded and sentence imposed in the case of O'Neil. Both took writs of error, and the cases were argued together in the Supreme Court. In the case of McManus, as well as O'Neil, it was alleged that the court erred, 1. In admitting the evidence of Canning; 2 and 3, in the answers to the points of defendants; 4 and 5, in the portions of the charge noted, and 6, in failing to consider on the argument of the motion for a new trial, the after and newly-discovered evidence with reference to the character of Morgan P. Davis for truth and veracity, and also the testimony of trustworthy witnesses, showing that Morgan P. Davis had testified falsely to the material facts, on the trial of this case. This evidence was brought to the knowledge of counsel after trial and verdict; depositions of witnesses were taken in Bradford county, which depositions were

[McManus *v.* Commonwealth.]

submitted to the court below, and the attention of the Supreme Court at the argument in said court was asked to this evidence, as it was subjoined in the appendix of the defendant's paper-book.

*John K. Clement, E. W. Greenough* and *George B. Renn,* for plaintiff in error.—It is not proposed in the offer contained in the first assignment of error to show that the society of the " Ancient Order of Hibernians" ordered, directed, approved of, or counselled this murder; nor that the society had any knowledge that it was to be committed, or by whom it was committed. How can the existence of this society furnish a motive for this crime of murder ? The offer, without suggesting that Peter McManus was induced by the society to commit the crime, or in any way to connect the society with it, simply proposes to make the prisoner responsible for lawless and criminal acts of men said to belong to a secret society of which he was a member, men with whom he is not brought in connection and did not know. The offer does not hint that O'Neil, the "strange man," or McManus, or either of the other persons who were in company with them, committed this or any other crime, nor is there an attempt made to show that the society of Mollie Maguires planned the murder of Hesser. Upon what principle of law or rule of evidence then, was this testimony admitted ? Members of the Ancient and Honorable order of Free and Accepted Masons, Odd Fellows, of every secret order, and of the Christian church, have, from time to time, committed crimes, but will it be pretended that, therefore it would be admissible to put in evidence the fact that a man, on trial for murder, belonged to either of these institutions, for the purpose of charging him with the responsibility of the criminal acts of others; or that there was a tendency to commit crime in these societies.

The presumption of good character, the law maintains with equal positiveness. It cannot be taken from the prisoner, by showing him to have had evil associations, or companionship with criminals, or by showing him to have been guilty of other criminal acts. The Commonwealth is not permitted to attack the character of the accused, he not having put it in issue.

This case in essential features differs from all the reported cases in which the courts have permitted the Commonwealth to show that the defendants were members of the secret order of " Mollie Maguires" or "Ancient Order of Hibernians."

*Lewis Dewart* and *George W. Ryon,* for the Commonwealth.— The testimony received explained fully the motives and conduct of the prisoner and John O'Neil. It explained why the prisoner talked so freely with Canning on the subject of the murder, and what McManus meant when he told O'Neil, in their conversation in the dark recesses of the mine, in answer to O'Neil expressing

10 Norris—5

[McManus *v.* Commonwealth.]

himself as being sorry, "that it would have been death to them if they had not done it, and before he would violate his oath he would do it again." And also what he meant when he said to O'Neil on another occasion in the same mine, in the presence of Donnelly, another Mollie, in answer to O'Neil when he was expressing a fear that some one had overheard them when they were planning the Hesser murder. The admission of this evidence is justified by recent decisions: Carroll et al. *v.* Commonwealth, 3 Norris 107; Campbell *v.* Commonwealth, Id. 187; Hester et al. *v.* Commonwealth, 4 Id. 139. The facts contained in this offer and admitted in evidence were relevant, direct and essential. Without them the conduct of the prisoner and his associates would be explicable on no recognised or rational theory regarding the motives and modes of human action. With them a jury was enabled to understand how the brutal and cold-blooded conversation in the house of Henry Long could have been had without scarcely any concealment or reserve; how a horrible murder could have been committed the following night, and how the killing could be talked over so fully among themselves in the recesses of the mine.

The refusal to grant a new trial is not reviewable here.

Mr. Justice PAXSON delivered the opinion of the court, June 23d 1879.

This record presents no new questions. The offer of evidence contained in the first assignment of error is almost identical with that in Hester *v.* Commonwealth, 4 Norris 139, and comes clearly within the ruling of that case. The fact that the prisoner was a member of the Ancient Order of Hibernians, commonly known as Mollie Maguires, and the character and purposes of the order, were competent for the purposes for which the evidence was offered, viz., to show motive for the commission of the murder, and to explain the relations existing between the witness, Dennis F. Canning, the prisoner and John O'Neil, who was jointly indicted with the prisoner for this murder, and why the admissions, declarations and conversations referred to in the offer and already in evidence, were made and had. There was the same mystery about this murder that has marked so many similar crimes in the mining regions for some years past. There was nothing to indicate that robbery was the object, and without some evidence to throw light upon it, the act was inexplicable. There is the same mystery in the conversations between the prisoner and O'Neil, as detailed by the witness Morgan P. Davis. The prisoner was a body-master and O'Neil a member of the order. Their conversation tended to show that they were both members of a secret, oath-bound organization. The witness Canning was county delegate of the order at the time; the declarations and admissions of the prisoner referred to were made to the witness, and to John O'Neil, as fellow members

of said organization.   This accounts for the making of statements and declarations, which under other circumstances would seem almost incredible; but under the light of this evidence the jury were enabled to understand why the confidences were made.   It is also to be observed that when the offer was made the evidence already in tended strongly to connect the prisoner and O'Neil with the crime.   On the occasion when Pickey Donnelly was present, it is evident their conversation referred to a previous planning of the murder.   O'Neil expressed his fear that some persons who had passed them upon the night when they planned the murder of Mr. Hesser, had heard them, as they "were rather full and talked rather loud," when McManus replied, "keep quiet and mouth shut; it is all dark only to our party."   The evidence tends to show a conspiracy; that the murder was carefully planned beforehand, and that the defendant was one of the conspirators.   I need not pursue this branch of the case further.   I have said enough to show that the evidence was competent under Hester v. Commonwealth and prior cases.

Those portions of the charge of the learned judge, and answers to points, embraced in the second, third, fourth and fifth assignments are entirely free from error, and need not be discussed. There was sufficient evidence of the prisoner's participation in the crime to submit to the jury, and the charge of the court was a clear, adequate and impartial presentation of the facts, and the law as applicable to them.

The matter referred to in the sixth assignment is not reviewable here.   It is but just to the court below, however, to say, that the testimony on the motion for a new trial appears to have been carefully considered.   That it did not produce the effect upon the mind of the learned judge that was intended, is the prisoner's misfortune. It is a matter with which we have nothing to do.

> The judgment is affirmed, and it is ordered that the record be remitted to the Oyer and Terminer for the purposes of execution.