## Commonwealth *v.* Gold et ux., Appellants.

Argued April 10, 1944.   Before KELLER, P. J., BALD-RIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*Jacob Seligsohn,* with him *N. J. Lippard,* for appellants.

*Earle R. Jackson,* Assistant District Attorney, with him *Russell H. Adams,* District Attorney for appellee.

OPINION BY JAMES, J., July 15, 1944:

Sam Gold was charged in an indictment with larceny and receiving, and his wife, Betty Gold, in a separate indictment, with receiving the following personal property: one Spartan fan, one Silex coffee maker and certain other electrical appliances belonging to Joseph Gold, trading and doing business as the Liberty Incandescent Supply Company. A third indictment charged both defendants with the larceny and receiving of one Emerson radio and one lady's white gold diamond ring, belonging to one Nellie Reiter.

The jury found the defendants guilty on the first two

indictments and Betty Gold guilty of receiving on the third indictment. From the judgments and sentences imposed upon these convictions separate appeals were taken, and will be disposed of in this opinion.

The principal question raised on the conviction on the first two indictments is whether the Commonwealth produced sufficient evidence to prove the corpus delicti. Appellants argue that the evidence failed to establish the ownership of the articles alleged to have been stolen. Although no action was taken by defendants during the trial questioning the sufficiency of the evidence, what this court said in *Commonwealth v. Bird*, 152 Pa. Superior Ct. 648, 33 A. 2d 531, is applicable to the present case: "It is true defendant took no action during the trial questioning the sufficiency of the evidence to support the conviction. Ordinarily questions not raised in the court below are not considered by us on appeal unless the error is basic and fundamental: Commonwealth v. Kahn, 116 Pa. Superior Ct. 28, 30, 176 A. 242. ...... One should not be deprived of his liberty because of the inadvertence of a trial judge or oversight of counsel in failing to call attention to the error which offends against the fundamentals of a fair and impartial trial: Commonwealth v. O'Brien, 312 Pa. 543, 168 A. 244." To avoid the injustice of a conviction where no crime exists, the law has adopted a rule of caution which holds that the corpus delicti must be proven before a conviction can stand. This is emphasized where the state's case depends on a confession by defendant. The fact that a crime has been committed by someone must be shown before the confession will be received: *Gray v. Commonwealth*, 101 Pa. 380; *Commonwealth v. Puglise*, 276 Pa. 235; *Commonwealth v. Gardner*, 282 Pa. 458. Viewed in the light of these principles, what did the Commonwealth establish? We shall not give in detail the Commonwealth's testimony, but only that which we regard as the strongest testimony bearing on the ownership of the property involved.

Commonwealth called Albert C. Gans, a police officer for the City of Pittsburgh, who, on the morning of August 10, 1943, arrested both defendants at their apartment. Later a search was made of the premises and the articles specified in the bills of indictment, along with other articles, were taken from the home to the police station. As to the ownership and theft of the articles seized he testified as follows: "Q. And then was it identified by any one? A. Mr. Goldsmith of the Liberty Incandescent Supply identified about seventy-five per cent of this merchandise. Q. And after you entered his home you took these various articles from his home? A. That's right. Q. By what authority did you take these articles? A. He admitted they were stolen from his brother at the time we arrested him. ...... A. He didn't mention any particular item. He said that the electrical appliances had been stolen from his brother's store where he worked. ...... Q. Did you find out since this whether any of these articles had been stolen? A. Why, the biggest part of the stuff has been turned back to the Liberty Incandescent Company as stolen property. ...... A. They were identified by the Liberty Incandescent Equipment Company as being their property. Q. Who identified them as their property? A. Mr. Goldsmith. ...... Q. Mr. Gans, you stated he admitted stealing all these articles, the articles you enumerated here, is that correct? A. I said that the electric appliances, that Mr. Sam Gold told us that the electric appliances had been stolen from his brother's place of business, Liberty Incandescent Company, 805 Liberty Avenue. Q. You have used the name "Joseph Gold" and "Joseph Goldsmith" in connection with the brother. Which is it, do you know? A. Joseph Gold is the brother. Mr. Goldsmith is the manager of the company."

Bertrand Goldsmith, manager of the Liberty Incandescent Supply Company, testified in part as fol-

lows: "Q. Do you know the defendant here, Sam Gold? A. Yes, sir. Q. Was he employed by your company? A. He was. Q. Did you see these goods that were at No. 4 police station? A. I was called in by officer Gans to identify them, yes, sir. Q. Whose goods were they? A. These goods could have come from our store. It was the type of merchandise that we sell. Q. Was there any price tags on them or anything? A. No. ...... Q. They were in cartons? A. Some were in cartons, some were loose; the fans were loose, several things were loose. Q. You don't know how they got out of the store? A. No, sir. Q. Did this defendant have access to the store room and the stock? A. Sure. Q. What was his position there? A. A salesman. ...... Q. Well, do you know whether or not any of those articles were purchased by Mr. Gold while he was there? A. I couldn't say they were or weren't. Q. Would there be any way of checking up to see whether he had purchased them or had not purchased them? A. No. A person that is employed in the store is usually considered honest enough to do the right thing. There is no necessity for checking. ...... Q. Do you know whether or not he had stolen or misappropriated anything to his own use? A. No, I couldn't say that. Q. Do you know whether this Spartan radio was taken from the Incandescent Light Company? A. You mean the Spartan fan? Q. The Spartan fan? A. I wouldn't know. We did carry Spartan fans. Q. Do you know whether this Silex was taken from there or not, and not paid for? A. I couldn't say that anything was taken from the store and not paid for. My only occurrence in this is a matter that I was told by the officers that the man had said that he had taken this merchandise, and as the merchandise was merchandise that came—that could have come from our store, I naturally said yes, if the man admits that he has taken it. But it could have come from our store, it isn't likely that a man will go

to another store and buy merchandise he can buy from his own employer. ...... Q. As far as you know, these articles could have been purchased by Mr. Gold and deducted or credited in his cash account? A. Yes, it's possible. ...... A. And I am responsible to the degree that everything goes right in that store. Mr. Sam Gold is Mr. Joseph Gold's brother and it isn't conceded that anything wrong would happen from his brother, and my only knowledge of the stock having been stolen was I was told by the officer that Sam admitted that he had taken the merchandise from the store. Q. Then you went out and claimed it as stolen goods? A. I went out and recognized it as merchandise which could have come from our store. Q. Well, you took it, you claimed it and took it? A. It was turned over to me and I still have it. Q. You took it and signed for it? A. I signed for it as having received the merchandise more as a custodian will sign for receiving back merchandise that he had taken."

Thus at the close of the Commonwealth's case we have the testimony of the officer that Sam Gold had admitted the theft of certain articles and identified by the manager of the Supply Company as the property of the Supply Company; but when the manager was called as a witness, he testified that although the merchandise could have come from the store, he could not and did not establish that the goods were the property of the Liberty Incandescent Supply Company, or that they had been stolen from its stock but that possibly they could have been purchased at the store. For the jury thus to find who was the real owner, was based upon conjecture. This is not the case of proof solely upon circumstantial evidence which we have frequently upheld, but a clear case of failure of the Commonwealth to prove the ownership of the articles alleged to have been stolen or received. If the agent of the owner could not identify, how could the jury determine. Consider-

ing all the circumstances, the relationship between the owner and the defendants, between the manager and the defendants, one can readily surmise why the manager suffered a loss of memory, either in fact or prompted by the desire not to pursue the prosecution. Yet whatever the reason, the proof did not establish the allegations of the indictment that the goods were the property of the Supply Company, or who was the real owner. The admission of the defendant that the goods taken were the property of the Supply Company was a strong corroboration, but unless the main fact of ownership was proven, it was not of itself sufficient.

We are satisfied that the proof was not sufficient to sustain the conviction of Sam Gold and Betty Gold upon the first two indictments.

On the conviction of Betty Gold of receiving the ring (the item of a radio having been withdrawn from the jury), there was ample testimony to establish who was the owner of the ring and that it was in the possession of the defendant. Records of prior convictions of Betty Gold on the charges of larceny were introduced in evidence. At the time they were admitted the court, in part, said: "Only for such light as they may throw on the credibility of the defendant".

The records of previous convictions which are admissible to attack the credibility of the defendant in a criminal case, who has testified in his own behalf, are such only as affect credibility, that is, conviction of a felony or a misdemeanor in the nature of a "crimen falsi". *Commonwealth v. Jones*, 334 Pa. 321, 5 A. 2d 804; *Commonwealth v. Schambers*, 110 Pa. Superior Ct. 61, 64, 167 A. 645.

Appellant attempts to interpret this rule so that it reads not only misdemeanors in the nature of a "crimen falsi" but felonies in the nature of "crimen falsi". We are unable to find any basis for such distinction. In laying down the above general rule we frequently find

the rule stated as follows: "felonies *and* misdemeanors in the nature of crimen falsi"; but in so stating we find no reason for holding that it was intended to destroy the distinction between these two classes of crimes. At common law, as was said by President Judge KELLER in *Commonwealth v. Mueller,* 153 Pa. Superior Ct. 524, 34 A. 2d 321, "when we use the expression, 'a misdemeanor in the nature of crimen falsi', we mean a crime less than felony that by its very nature tends to cast doubt on the veracity of one who commits it". Felonies of whatever character, being infamous crimes, stand in a class by themselves, but not every misdemeanor, only misdemeanors in the nature of "crimen falsi", carry with them a cloud upon the veracity of the defendant, or a witness whose credibility is attacked by the record of conviction. We believe the records were properly admitted.

In the course of the charge the court said, "in rebuttal there have been introduced four records of prior convictions. Two of them are introduced to contradict the defendant, Betty Gold, on the matter of her name, to contradict her as to her being known previously as Emma Ogden. The other two were introduced to show prior convictions of crime, and those records indicate that this defendant, Betty Gold, did on prior occasions enter pleas of guilt to these charges of felony". Appellant excepts to the language *"the other two were introduced to show prior convictions of crime".* We cannot take this excerpt alone but must take into consideration what the court said in the admission of the records, that it was "only for such light as they may throw on the credibility of the defendant" and for the further reason that immediately following the excerpt from the charge the court said, "you will remember what I said previously, those records are introduced to throw possible light on the credibility of the defendant. The question raised by those records is: Is this person

to be believed in view of these records? It does not follow in all cases that a person who has been guilty of crime is not to be believed, but you are entitled to consider the circumstances of those prior criminal cases in passing upon her credibility". We find no ground for complaint when the charge is read as a whole.

The appeals in Nos. 209 and 210 April Term, 1944 are sustained and the judgments and sentences involved therein are set aside and appellants discharged. The appeal of Betty Gold in No. 216 April Term, 1944 is dismissed and the judgment and sentence involved therein is affirmed, and the said Betty Gold is directed to appear in the court below at such time as she may be there called and that she be by that court committed until she has complied with her sentence or any part of it that had not been performed at the time the appeal was made a supersedeas.