Commonwealth *v.* Truitt, Appellant.

Argued November 15, 1951. Before DREW, C. J., STERN, STEARNE, BELL, LADNER and CHIDSEY, JJ.

*Earle R. Jackson* and *Harry I. Glick*, with them *Joseph Bonidy*, for appellants.

*L. Alexander Sculco,* District Attorney, and *Joseph M. Loughran,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, December 19, 1951:

The allocatur is from the Superior Court which affirmed convictions and sentences of the Court of Quarter Sessions of Westmoreland County.

Harry W. Truitt, Jr., John F. Allen, Lester Peay, and Charles B. Tarpley were indicted charged with (1) obstructing an officer in attempting to make an arrest, and (2) assaulting and beating an officer. The jury found all of the defendants guilty and each, except Tarpley (whose sentence was deferred because of illness) was sentenced to one year in the Allegheny County Workhouse. The same four defendants were also indicted charged with (1) assault and battery, and (2) aggravated assault and battery upon the person of John Bordonaro, who was Captain of Police in the City of New Kensington, Westmoreland County. They were all found guilty as indicted, by the jury, and each, except Tarpley, was sentenced to the Allegheny County Workhouse for three years. Robert T. Smith and Charles Tarpley were also indicted for affray, and were found guilty. Smith was sentenced on this conviction for a term of not less than one and one-half years, and not more than three years. The appeals are by Truitt, Allen, Peay, and Smith.

Appellants do not question the sufficiency of the evidence to sustain the verdicts. Their appeals relate to the refusal of the court below to grant a new trial. The questions presented are based upon (1) the admission of allegedly prejudicial evidence concerning communistic connections and activities of Truitt and Smith; (2) the failure of the trial judge to charge on Truitt's constitutional right of immunity from search

and seizure by an officer attempting to make an arrest without a warrant in Truitt's home; (3) the refusal of the motion of counsel for appellants to withdraw a juror when it was shown during the trial that a woman juror had been driven home the preceding day by the alderman before whom the defendants' preliminary hearing was held.

The Eagle Clothing Company store in New Kensington was being picketed because of a strike against the Ellay Company of New York City, a wholesale clothing company. Employes of Ellay were represented by local 65 of the Wholesale and Warehouse Workers Union. No labor dispute existed with Eagle's employes. Defendant Smith, who was not a member of Local 65, was sent by that Union from New York to New Kensington as strike leader. In Pittsburgh he hired defendants Peay and Tarpley and also other male and female pickets. Defendant Truitt is a dental technician, whose office and apartment are near the Eagle store. Officials of Local 65 had directed Smith to contact Truitt. All the pickets, including defendants, used Truitt's office and apartment for their personal convenience.

On Saturday night March 18, 1950, at about 8:30, in front of the picketed store, in the center of town, at the height of the town's shopping hours, a customer of the Eagle store, John Fee, was, according to the testimony produced by the Commonwealth, attacked and beaten by Smith and other pickets while he was leaving the store after having made a purchase. All of defendants were involved. A friend of Fee came to his rescue. A general fight or fray ensued, in which many people engaged. A large crowd gathered. Police rushed to the scene. Police Captain Bordonaro observed Smith running away. Smith was followed by the Captain and was seen entering defendant Truitt's apartment through the rear entrance.

What thereafter immediately happened is summarized by President Judge Rhodes in his opinion: "Bordonaro returned to the scene to procure the assistance of another officer. Thereafter he went up the front stairs to Truitt's office on the second floor of the building while the other officer watched the rear entrance. Bordonaro met Truitt, Allen, and Peay coming down the steps. He demanded that Truitt surrender Smith but was told by Truitt that there was no one there. Bordonaro went to Truitt's apartment on the third floor in his search for Smith. As he came down Bordonaro met Truitt, Allen, and Peay on the second floor landing. Bordonaro again demanded that Truitt surrender Smith. According to Bordonaro, Truitt replied: 'Get out of here. You ain't got no business in here. You ain't getting any fellow.' Truitt, Allen, Peay, and Tarpley attacked the officer. Someone hit him in the back as he attempted to use the telephone. Truitt took hold of Bordonaro and forcibly removed the telephone from his hands. In doing so, Bordonaro's arm hit the door and his wrist was severely injured. Truitt thereupon said to Bordonaro: 'Don't make me laugh; you're not taking that fellow out of here anyhow.' Peay grabbed Bordonaro and ripped his coat. Bordonaro then informed Truitt, Allen, and Peay that they were under arrest; he succeeded in getting Allen and Peay downstairs where they were turned over to other police. Truitt returned to his apartment. He was later arrested by other officers."

Defendants, in some particulars, contradicted various statements of some of the Commonwealth's witnesses relating to the assault and battery upon the Police Captain and to the obstruction in the arrests. They sought to minimize the Police Captain's painful injuries, torn clothing, and the mauling to which he was subjected. However, in essential features, the

charges in the indictments were amply and sufficiently established.

The chief complaint of defendants is that the court below erred in refusing to grant a new trial because of the injection into the case of incompetent and irrelevant testimony concerning communist connections and activities of defendant Truitt and Smith. It is charged that this is a collateral issue, and had nothing to do with the crimes charged for which defendants were indicted, and should not have been permitted in the record; that the effect of such innuendoes, inferences and unsupported irrelevant accusations created prejudice and antagonism against defendants in the minds of the jury.

The trial judge in his charge said: "At this stage I want to say to you that these men are not being tried for being communists. It is your duty and mine and that of the Commonwealth, regardless of what we may think of their beliefs, to give them a fair and a just trial, under the laws of the United States and the Commonwealth of Pennsylvania, and in doing that, you are to take the testimony in its entirety and decide fairly and reasonably whether these men are guilty of committing an affray and an assault and battery or whether or not they are guilty of resisting an officer, in obstructing him in the service of process."

The Commonwealth contends that even if such testimony was unsupported and irrelevant, nevertheless, defendants' able and experienced counsel without objection permitted such testimony to be given. The Superior Court decided, in such circumstances, that the testimony was properly admitted. President Judge RHODES said: "Appellants elected to try their case with the communist issue injected into it, and we cannot say they did not have a purpose in doing so. Evidence introduced by the Commonwealth, without objection, established that Local 65, which conducted the picketing

at the New Kensington store, was communist dominated and had been thrown out of the C. I. O. for that reason. The cross-examination of Truitt and Smith as to the character of Local 65 and their connection with it was proper. Likewise, without objection, Truitt and Smith were cross-examined as to whether they were Communists or had any affiliations with the party. Smith had been hired by Local 65 as the picket captain; he brought the pickets to New Kensington on behalf of that organization, and he met Truitt the same day. Truitt knew the officers of Local 65, and was contacted by its organizer from New York relative to the picketing. Appellants met this subsidiary issue and presented testimony in contradiction of the testimony of Commonwealth's rebuttal witness Cvetic. It was relevant for the Commonwealth to disclose fully the circumstances surrounding the commission of the crimes with which appellants were charged and on trial. It was permissible for the Commonwealth to show Truitt's relations with Smith and the pickets generally and with Local 65. This evidence had a bearing on whether Truitt harbored Smith at the time Smith was sought by the police, and as to whether Truitt did commit the offenses of resisting arrest and assaulting an officer. The testimony as to the communistic character of Local 65 and the communistic connections and activities of appellants relates to an issue in which the appellants had tacitly acquiesced. The evidence as to communism was in the case for all purposes for which it was relevant, and this applies to Cvetic's testimony introduced by the Commonwealth in rebuttal. See Com. v. Albert, 169 Pa. Superior Ct. 318, 82 A. 2d 695. The evidence relating to appellants' alleged communistic connections was certainly admissible also to show appellants' motive in committing the offenses with which they were charged. Cf. Com. v. Campolla, 28 Pa. Superior Ct. 379; Hester v. Com., 85 Pa. 139, 156. Proof of

motive in the commission of crimes is not always necessary, but such proof is always relevant. Com. v. De Petro, 350 Pa. 567, 572, 39 A. 2d 838. It is therefore not necessary to consider whether the evidence relating to communism was properly limited by the trial judge to its effect solely as impeaching evidence within the rule set forth in Herr v. Erb, 163 Pa. Superior Ct. 430, 433, 435, 62 A. 2d 75, and Com. v. Blose, 160 Pa. Superior Ct. 165, 50 A. 2d 742."

With this we are unable to agree. Charges may not be established through innuendo, inference or unsupported irrelevant accusations: *Schlesinger Petition,* 367 Pa. 476, 81 A. 2d 316; *Milasinovich v. The Serbian Progressive Club, Inc.,* 369 Pa. 26, 84 A. 2d 571. True the Eagle Store manager was permitted to testify without objection that Local Union 65 was "thrown out of the C. I. O. because they are communist dominated". Such a statement, unsupported, by an obviously incompetent witness, is but hearsay. It possesses no probative or relevant value whatsoever. Whether Local 65 is in fact communist dominated was, therefore, a *collateral* issue in this case.

Defendant Truitt, without objection, was cross-examined concerning his membership in the Progressive Party, and whether or not such political party was "dominated by communists". Here again, such testimony was without the slightest probative or relevant value. If it had been objected to it ought to have been excluded. Defendant Smith was cross-examined about the communist influence in Local No. 65, although he was not a member of it. Smith was also questioned whether or not certain named officers of the Union had been cited by the United States Congress "for communistic activities". Counsel for defendant then objected in the following language: "By Mr. McKague: Now if the court please, something tells me this is the time to object to this going into the stuff that Mr. Loughran

is trying to inject into this case for the purpose of prejudicing these defendants." The objection was overruled and the cross-examination proceeded concerning the communist activities of Local 65 and of the witness. Both defendants Truitt and Smith denied that they were communists. In rebuttal the Commonwealth offered the testimony of Matt Cvetic, who styled himself "an undercover agent with the Federal Bureau of Investigation". His testimony was offered to attack the credibility of defendant Truitt's testimony when he denied that he was a communist. An objection was then entered by the attorney for defendants, which was overruled and an exception allowed. The witness was permitted to testify that Truitt was an active communist, and gave testimony concerning Truitt's communist activities. This was clearly error. Truitt's testimony, on cross-examination, that he was not a communist was obviously upon a collateral matter. A witness cannot be contradicted on collateral matters to test credibility: *Hester v. The Commonwealth*, 85 Pa. 139; *Commonwealth v. Petrillo*, 341 Pa. 209, 19 A. 2d 288.

We agree that counsel may not permit the admission of irrelevant testimony, without objection, and if the case should be decided adversely, then to secure a. new trial upon the ground of fundamental error. In homicide cases, where a defendant's life may be in jeopardy because of the failure of counsel to perform his duty, the court, impelled by the gravity of defendant's situation, will examine into the record and ascertain if the trial was free from error: *Commonwealth v. Scott*, 284 Pa. 159, 162, 130 A. 317; *Commonwealth v. Corrie*, 302 Pa. 431, 436, 153 A. 743; *Commonwealth v. Stowers*, 363 Pa. 435, 437, 70 A. 2d 226. Whether defendants, or any of them, are members of the communist party or adhere to its doctrines is a matter entirely foreign to the issue of guilt or innocence on a charge of affray, assault and battery and obstructing an of-

ficer while attempting to make an arrest. Nor is such evidence relevant to indicate motive, and to rebut defendants' contention that they were engaged in a *bona fide* labor dispute. Even a *bona fide* labor dispute would not justify the conduct of defendants in assaulting an officer, obstructing an officer in attempting to make an arrest and in engaging in an affray. Such evidence is collateral and has no place in this case. In I Wigmore, Evidence, sec. 57, p. 454, it is stated: ". . . a doctrine of Auxiliary Policy . . . operates to exclude what is relevant,—the policy of avoiding the uncontrollable and undue prejudice, and possible unjust condemnation, which such evidence might induce: . . ."

And, on page 456: "The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court."

We are aware that judicial notice is taken that the communist party is a subversive organization which conspires to teach and advocate the overthrow of the government of the United States by force and violence: *Milasinovich v. The Serbian Progressive Club, Inc.,* supra, and the cases therein cited. There is, however, no competent proof that Local 65 is communistic. There is no proof that Union Local No. 65, and defendants Truitt or Smith, *as communists,* were guilty of similar crimes in other cases, in a pattern, design or scheme of criminal conduct. In *Hester v. The Commonwealth,* 85 Pa. 139, a murder case, other crimes by defendants as members of an organization known as the Mollie Maguires, were permitted in order to prove motive. In *Commonwealth v. Strantz,* 328 Pa. 33, 195 A. 75, evidence of other crimes was held competent to prove a common scheme or plan. See also *Commonwealth v. Fugmann,* 330 Pa. 4, 198 A. 99; *Common-*

*wealth v. Kluska,* 333 Pa. 65, 3 A. 2d 398; *Commonwealth v. Darcy,* 362 Pa. 259, 66 A. 2d 663.

The defendants' contention that it was fundamental error for the trial judge to fail to charge the jury upon the constitutional guarantee against the search of defendant Truitt's home in attempting to make an arrest without a warrant, was not raised at the trial and therefore need not be considered in this opinion. We also agree that the question of whether or not a juror was guilty of misconduct in driving home after adjournment of the court in the automobile of the alderman who acted as committing magistrate, is a matter of the exercise of discretion by the trial judge. Under the circumstances in this case, we are not convinced that it was error for the trial judge to refuse a motion to declare a mistrial merely because there was *opportunity* to influence such juror: 23 C. J. S. sec. 1447, p. 1179; *Commonwealth v. Craven,* 138 Pa. Superior Ct. 436, 447, 11 A. 2d 191, 196.

The judgments are reversed, the sentences vacated, and a new trial ordered.

---

CONCURRING OPINION BY MR. JUSTICE HORACE STERN:

Mr. Justice ALLEN M. STEARNE, writing the opinion in this case for the court, has fully vindicated the conclusion reached, namely, that the defendants were not fairly convicted and that a new trial must be granted them. It was therefore unnecessary to discuss other matters which marked, and, in my opinion, gravely marred, the conduct of the trial. But with the greater latitude permitted in a concurring opinion I desire to give expression to my views upon certain additional features of the proceedings.

It is, of course, elementary that, under the provisions of both our Federal and State Constitutions, the

defendants were entitled to a fair and impartial trial, such being a requirement, indeed the essential requirement, of "due process of law". As was said by Judge MAJOR in *United States v. Haupt,* 136 F. 2d 661, 671, the right of trial by jury "comprehends a fair determination, free from passion or prejudice, of the issues involved. The right is all-inclusive; it embraces every class and type of person. Those for whom we have contempt or even hatred are equally entitled to its benefit." Language much to the same effect was expressed by the late Chief Justice MAXEY in *Commonwealth v. Petrillo,* 338 Pa. 65, 97, 98, 12 A. 2d 317, 332, 333. The trial in the present case was not "free from passion or prejudice"; on the contrary, passion and prejudice ran riot throughout its entire course. Page after page of the record is replete with attempts on the part of the Commonwealth to establish that "Local 65" in New York was controlled by communists and that Philip Murray had thrown it out of the C: I. O. because of its being communist dominated; that all its officers were communists; that its president and vice-president had been cited by a Committee of Congress for communist activities; that apparently the defendants did not care whether or not those persons were in fact communists; that defendants' counsel probably had in mind to charge Local 65, rather than defendant Truitt, for his services in the case; that Truitt was a State committeeman of the Progressive Party; that that party was dominated and controlled by communists; that Henry Wallace had withdrawn from it; that Truitt had had meetings of the Progressive Party in his house; that he had also held meetings there of the American Slav Congress, of which he was a member; that that organization was controlled by the Communist Party and had been declared subversive by a Congressional Committee; that Truitt had been seen at communist

meetings; and that all the other defendants were communists also.

Not content with the creation of prejudice against the defendants which was bound to result from the injection into the trial of these insinuations of communist affiliations, (charges which as Mr. Justice STEARNE points out, were not at all proved), the Commonwealth next proceeded to bring the race question into the case. Three of the defendants were colored men. The District Attorney "for purpose of the record" asked Truitt whether he wasn't of the Caucasian race,— a white man,— and then asked him in cross-examination why he would allow "these colored people" to "associate" with his two daughters and two white women pickets; (the "association" in fact consisting merely of the defendants and these women being temporarily engaged in conversation in the living room of Truitt's house with Mrs. Truitt present). Truitt replied that he had never discriminated in choosing his friends because of their color, whereupon the District Attorney said: "You want the jury to believe that?" and again asked whether he never discriminated between colored people and white friends associating with his daughters. He suggestively inquired of one of the defendants on cross-examination whether Truitt did not have "girls" on his third floor to "entertain" the defendants.

Pursuing still another line of prejudicial cross-examination of the defendants, the District Attorney pressed them to explain why they were picketing stores not directly concerned with the labor strike in New York. He brought out in the testimony that they were not employed in any store in New Kensington or in the establishment in New York whose employes were on strike; that they were not members of Local 65; that they were merely hired pickets; that they did not

live in New Kensington but had come there from New York and from Pittsburgh. He examined them as to how much they were paid, whether they believed in the legality of secondary boycotts, and why they would want to prevent employes in New Kensington from working merely because of a strike in New York.

The trial judge, rehearsing the testimony in his charge to the jury, repeated in detail all this objectionable evidence. True, he told the jury that "these men are not being tried for being communists" and that they were not to let any prejudice that they might have against communism or against the Communist Party influence their decision. But of course that admonition was, under the circumstances, nothing more than a formal, futile pronouncement, hopelessly inadequate to repair the damage that had been done by the mass of testimony on that subject that had been received in evidence. If the court thought it necessary to deliver such a warning it is difficult to understand why it allowed all the testimony in regard to communism to be brought into the case, and why it repeated all of it in its charge to the jury. *There are at least four places in the record where counsel for defendants strenuously objected to the admission of such testimony,* and even if he had failed to do so it would have been the duty of the court of its own motion to prevent the injection into the trial of such wholly irrelevant, incompetent, inflammatory and sinister evidence: *Wagner v. Hazle Township,* 215 Pa. 219, 225, 64 A. 405, 407. Nor is an appellate court barred from considering fundamental errors in the conduct of a trial even though defense counsel may have failed (if not deliberately but merely through carelessness or neglect) to register objections and take exceptions thereto. In the ringing words of Mr. Justice (now Chief Justice) DREW in *Commonwealth v. O'Brien,* 312 Pa. 543, 546, 168 A. 244, 245: "A man is not to be deprived

of his liberty and reputation because of the inadvertence of a trial judge or the carelessness of his counsel in failing to call the attention of the trial court to palpable error which offends against the fundamentals of a fair and impartial trial." The principle·thus stated has since been followed in numerous cases both in our own and the Superior Court: *Commonwealth v. Robinson,* 317 Pa. 321, 323, 176 A. 908, 909; *Commonwealth v. Wiand,* 151 Pa. Superior Ct. 444, 448, 449, 30 A. 2d 635, 637; *Commonwealth v. Bird,* 152 Pa. Superior Ct. 648, 651, 33 A. 2d 531, 532, 533; *Commonwealth v. Gold,* 155 Pa. Superior Ct. 364, 366, 38 A. 2d 486, 487; *Commonwealth v. O'Toole,* 159 Pa. Superior Ct. 592, 596, 49 A. 2d 267, 268; *Commonwealth v. Balles,* 160 Pa. Superior Ct. 148, 154, 50 A. 2d 729; 732; *Commonwealth v. Jodlowsky,* 163 Pa. Superior Ct. 284, 286, 287, 60 A. 2d 836, 837.

Not only did the trial court admit all the testimony concerning communism as above stated, but it allowed the Commonwealth, over the objection of defendant's counsel, to call an undercover agent of the F. B. I. and elicit from him testimony to contradict, at great length, statements made by Truitt that he had never attended communist meetings. The admissibility of this testimony was clearly error. As pointed out in Mr. Justice STEARNE'S opinion, a witness can be contradicted, in order to test his credibility, only on matters germane to the issue being tried, the test of materiality of a fact brought out on cross-examination being whether the party cross-examining would. have been entitled to prove it as a part of his own case: *Herr v. Erb,* 163 Pa. Superior Ct. 430, 434, 435, 62 A. 2d 75, 77. Certainly no one would contend that the Commonwealth could properly have introduced in evidence the testimony of this F. B. I. agent as a part of its case in chief. And, even if it would have been proper to admit such evidence, it would have been the duty

of the trial judge to instruct the jury, not merely that the testimony was received to affect Truitt's credibility, but that that was its sole purpose, and that it was not to be considered as substantive evidence; the court would also have been obliged carefully to explain the significance of these terms and the differences between them: *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 172, 50 A. 2d 742, 745; *Herr v. Erb,* 163 Pa. Superior Ct. 430, 433, 434, 62 A. 2d 75, 77.

It is too clear to require elaboration that all the highly inflammatory personal attacks made on the defendants had nothing whatever to do with the inquiry as to whether they were guilty of the crimes charged in the bills of indictment. Being a member of the Communist Party, involving as it does the teaching and advocating of the overthrow of our government by force and violence, is itself a crime, and one far more grievous than any of those with which these defendants were charged; their conviction therefore should not have been sought by attempting to prove, or by insinuating, that they were guilty of this much graver crime for which they were not indicted nor then being tried. As to defendant Smith the sole issue was as to who started the fighting,—he or the witness Fee,—and on that point there was diverse testimony, there being an intimation that the latter, aided by his friends, might have been the real instigator of the fight that followed. As to the other defendants, there were also different stories told by the witnesses for the Commonwealth and the witnesses for the defendants as to who was responsible for the scuffle with the officer which took place at Truitt's home. Certainly in determining where the truth lay as to these factually controverted matters questions of communist affiliation, race, and the rights of labor to picket, were wholly immaterial.

There was another fundamental legal question involved, but completely ignored, in the trial, namely, the lawfulness of the presence of the officer in Truitt's home. It is hornbook law that an officer may not make an arrest for a misdemeanor unless the offense was committed in his presence. The crimes with which these defendants were charged were all misdemeanors: The Penal Code of 1939, §§314, 401, 708, 709. There is room for doubt in the testimony as to whether officer Bordonaro actually saw an affray being committed or defendant Smith engaging in any affray; apparently, when he came upon the scene, Smith was running away, whether because he had been the culpable aggressor, or, as he and others on his behalf testified, the victim of an assault. The question, therefore, should have been submitted to the jury as to whether the officer did witness the crime for which he attempted to seek out and arrest Smith in Truitt's home, and the jury should have been instructed that if the offense for which Smith was indicted and tried was not committed in the officer's presence the latter had no right, without a warrant, to attempt to arrest him in Truitt's home, for, under such circumstances, he would have been an intruder there, and Truitt would have had the constitutional right to prevent him from searching his home. It is true that this question was not raised at the trial by defendant's counsel, but it is so vital and fundamental, going to the very heart of the question as to the relative legal rights of the parties when the scuffle with the officer took place, that, under the authorities hereinbefore cited, this court may nevertheless take cognizance of it.

It follows that I am wholly in accord with the opinion of the court in this case and with the decision reversing the judgments, vacating the sentences, and ordering a new trial.

Mr. Justice Chidsey concurs in the majority opinion and also in this concurring opinion.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

John Fee was attacked and beaten by Smith, and other pickets while he was leaving the Eagle Store after having made a purchase. A riot ensued. Smith and Tarpley, defendants, were convicted of an affray; and Truitt, Tarpley, Allen and Peay were convicted of aggravated assault and battery upon an officer, and of obstructing an officer in attempting to make an arrest. *Defendants alleged that Fee attacked one of them and they merely defended themselves, and were in effect innocent bystanders;* and they denied that they caused an affray or assaulted the officer or obstructed justice.

The defendants were hired and paid by Local No. 65, a union in the City of New York. Local No. 65 sent two of the defendants from New York, who, under their orders, recruited in Pittsburgh and employed two other defendants to picket the Eagle Store in Westmoreland County, Pennsylvania. The employes of the Eagle Store were not members of Local No. 65, but were members of the C.I.O. Union; and there was no strike nor labor or industrial dispute in the Eagle Store. According to the testimony of a witness who was an undercover investigator of communist activities for the F. B. I., defendant Truitt was a communist; and according to the testimony of another witness, Local No. 65 was thrown out of the C.I.O. because it was "communist dominated". The majority opinion, in reversing the unanimous decision of the Superior Court which affirmed the rulings and judgment of the lower court, sustains the defendants' contention that it was reversible error to permit the charge of communism to be injected into this trial.

The theory on which the majority opinion is predicated is apparent from the following quotation therefrom: "Whether defendants, or any of them, are members of the communist party or adhere to its doctrines is a matter *entirely foreign to the issue* of guilt or innocence on a charge of affray, assault and battery and obstructing an officer while attempting to make an arrest. *Nor is such evidence relevant to indicate motive, . . .*"* The majority also held that the question of whether Local Union No. 65 or the Progressive Party was "dominated by communists" or "communist dominated" *was hearsay and without the* slightest probative or relevant value, even though it was admitted *without objection.* With this view I completely disagree.

Evidence tending to prove motive or design or plan or scheme of criminal conduct has always been admissible: *Hester v. Com.,* 85 Pa. 139; *McManus v. Com.,* 91 Pa. 57; *Com. v. Fragassa,* 278 Pa. 1, 122 A. 88; *Com. v. Campolla,* 28 Pa. Superior Ct. 379; *Com. v. Chalfa,* 313 Pa. 175, 178, 179, 169 A. 564; *Com. v. De Petro,* 350 Pa. 567, 572, 39 A. 2d 838; *Com. v. Edwards,* 318 Pa. 1, 178 A. 20. For example, it has been the established law of Pennsylvania for nearly one hundred years that evidence of similar and related crimes are admissible (even in murder trials) to prove motive or intent or design or a common scheme or plan: *Com. v. Strantz,* 328 Pa. 33, 195 A. 75; *Com. v. Darcy,* 362 Pa. 259, 66 A. 2d 663; *Com. v. Fugmann,* 330 Pa. 4, 198 A. 99; *Com. v. Kline,* 361 Pa. 434, 65 A. 2d 348; *Com. v. Williams,* 307 Pa. 134, 148, 160 A. 602; *Com. v. Krolak,* 164 Pa. Superior Ct. 288, 290, 64 A. 2d 522; *Com. v. Ransom,* 169 Pa. Superior Ct. 306, 82 A. 2d 547 (Approved in 369 Pa. 153, 85 A. 2d 125) ; 22 C.J.S. §688, page 1109.

---

* Italics throughout, ours.

In *Com. v. Williams*, 307 Pa., supra, this Court said (page 148) : "There are, however, many well recognized exceptions where the commission of another offense by the defendant may be received in evidence. Prior convictions can be admitted in evidence to show intent, scienter, motive, identity, plan, *or the accused to be one of an organization banded together to commit crimes of the sort charged,* or that such prior conviction or criminal act formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts; also to prove the mental condition when the defense was insanity, or to rebut the inference of mistake, or to show a guilty knowledge: Com. v. Coles, supra; Com. v. Cicere, 282 Pa. 492; Com. v. Dorst, 285 Pa. 232; Com. v. Quaranta, 295 Pa. 264. For these purposes prior convictions or criminal records may be brought out *either on cross-examination or by extrinsic testimony*: Goersen v. Com., supra; Com. v. Coles, supra; Com. v. Weiss, 284 Pa. 105; Com. v. Ferrigan, 44 Pa. 386; Wharton, Criminal Evidence (10th Edition) section 31. . . ."

While communism or membership in the Communist Party was not at the time of the trial a criminal offense in Pennsylvania, it is clear that *the principle established* by these cases is equally applicable to this case and *permits the introduction of any evidence tending to prove motive, design, scheme or plan.*

Commencing in 1934, some of us who studied communism have attempted to awaken America to the danger and menace of this worldwide revolutionary movement, which from the writings, the speeches, and the actions of its leaders is, beyond the peradventure of a doubt, the avowed mortal enemy of the United States. It is at long last recognized in this country first by the people and finally by some political leaders, some

union leaders and some courts that a major policy and goal of the communist party is to undermine, overthrow and destroy our Government by sabotage, force and violence.* However, it is not as clearly realized that the plans, the policies and the tactics by which the communists attempt to achieve their great goal is to promote assaults and fightings, to instigate strikes and labor disputes, to cause riots, to arouse class, creed and color passions, and to oppose by every means including force, the police and other agents and employees of local, state and national government. Many patriotic Americans still remain naive and blind to the practices of and the methods employed by the communists, and their ofttimes unwitting agents or unsuspecting stooges, especially in cases arising out of picketing, strikes or labor disputes.

The jury could have found, and obviously did find, that the aggressors and the instigators of the fighting with Fee were the defendants; that three of them caused the affrays and the rioting; that four of them assaulted a policeman and obstructed justice; and that all of this is exactly in accordance with the pattern, the policies, the motives, the design and the most frequently used methods and tactics of the Communist Party, and its members, and its politically-naive agents and employes.

Why then wasn't such evidence admissible to prove planning, motive and design?

---

* November 27, 1951, this Court for the first time "took judicial notice that the communist party is a subversive organization which conspires to teach and advocate the overthrow of the government of the United States by force and violence": *Milasinovich v. Serbian Progressive Club, Inc.*, 369 Pa. 26, 84 A. 2d 571. Cf. *McAndrew v. Scranton R. P. Co.*, 364 Pa. 504, 513, 72 A. 2d 780. See also: Act of June 23, 1947, 61 Stat. 136, 29 U. S. C., section 141 et seq.; *Dennis v. United States*, 341 U. S. 494 (1951).

In *Hester v. Com.,* 85 Pa. 139, where the defendant was convicted of *murder,* evidence of the policies of a secret organization known as the "Mollie Maguires", of which defendant was a member, was held to be admissible in order to prove motive, scheme or plans. This Court said (page 156) : "Its purpose was to explain the relations existing between the conspirators, the *reason, motive* and opportunity for their combined action, *and the nature of the tie that bound them together.* . . . It was proposed to prove that, *under its practical workings,* the organization had come to be the means of procuring *crimes of every grade* to be perpetrated . . ." A fortiori, in trials of affrays and assaulting an officer of the law, *the plans and policies, the methods and practical workings of communists and the Communist Party, and of a communist dominated union* (which imported and employed these pickets outside a store, in an important defense area, where no labor dispute was involved), should be admitted in order to prove reason and motive, the nature and tie that bound them together, the common scheme or plan to promote assaults and fights and to cause riots and to obstruct justice.

In *McManus v. Com.,* 91 Pa. 57, 66; in *Carroll v. Com.,* 84 Pa. 107; in *Campbell v. Com.,* 84 Pa. 187, the Commonwealth was permitted to introduce evidence *that defendant was a member* of the Ancient Order of Hibernians, commonly known as "Mollie Maguires", *and the character and purposes of the Order,* in order to show motive for the commission of the murder and to explain or indicate *the relations existing between the various defendants,* and to throw light upon acts which otherwise would have been inexplicable.

Similarly, in *Com. v. Fragassa,* 278 Pa. 1, 4, 122 A. 88, evidence was admitted to show that *defendants were members* of the Black Hand Society *two years be-*

*fore* the killing in question took place, *as well as the objects and purposes of the Black Hand Society.* The court admitted the evidence "for the purpose of show- ing the relationship between defendant and Daniele [a co-defendant] . . .", and ". . . to show a motive for the crime. . . . and that *its* [the Black Hand Society's] *purpose included various unlawful objects, such as blowing up houses and killing and robbing."*

In *Com. v. Krolak,* 164 Pa. Superior Ct., supra, where the defendant was indicted for assault and battery and he asserted, as here, that he was attacked and acted in self-defense, the Commonwealth was permitted to adduce evidence tending to establish that he and his companions had been engaged in a series of unprovoked assaults and batteries.

In *Com. v. Chalfa,* 313 Pa., supra, evidence concerning deceased's insurance was admissible to prove a motive for the killing by poison. Evidence with respect to defendant's knowledge of poison, and to the poisoning of other people was likewise admitted to prove purpose, scheme, plan and intent.

In *Com. v. Campolla,* 28 Pa. Superior Ct., supra, defendant was indicted for assault and for demanding by menaces and force $15. with intent to steal the same. The Commonwealth was permitted to offer evidence that defendant had invited others to join the Mafia Society, which, it was well known, terrorized Italians for the purpose of extorting money from them under threats of death or severe bodily injury. The court in its opinion said (page 383): "The evidence was admissible upon the ground, also, that it directly *tended to establish that the defendant was a member of an organization banded together to commit crimes of the kind charged . . ."*

It is clear from these authorities that evidence was admissible to prove defendants were communists and

were members of an organization banded together to commit crimes of the kind charged.

It may not be amiss to point out that evidence of communism is inadmissible in many criminal trials. For example, evidence that defendant is a communist, or a member of or employed by a communist dominated union would be highly prejudicial and inadmissible in a charge of adultery or rape, or assault and battery by automobile, or in the ordinary case of larceny, burglary or robbery (unless involved in or connected with government papers, secrets, war material, etc.), because the commission of one of these crimes is not a part of the communist doctrine, teachings or practices, and hence such evidence would not show motive or design.

The judgment of the Superior Court should be sustained for another reason. The defendants' experienced counsel failed to make timely objection to the introduction of this evidence and failed to move to strike it out, obviously feeling that it might help their case. It is conceded by the majority that ". . . the Eagle Store manager was permitted to testify *without objection* that Local Union 65 was 'thrown out of the C. I. O. because they are communist dominated':" that "Defendant Truitt, *without objection,* was cross-examined concerning his membership in the Progressive Party, and whether or not such political party was 'dominated by communists'"; that defendant Smith was cross-examined about the communist influence in Local No. 65, which employed him to organize picketing, [He admitted it didn't mean anything to him whether the officers were communists or not], with one objection towards the end of his cross-examination. The majority opinion holds that *this objection to this one question* was sufficient to cover and make inadmissible all the previous and subsequent questions by the District Attorney and all the Commonwealth's direct evidence, as well as its objected-to rebuttal evidence by Cvetic "an

undercover agent with the Federal Bureau of Investigation . . . that Truitt was an active communist, and . . . concerning Truitt's communist activities". On this point I again disagree with the view or conclusion of the majority.

I believe that *considering the issue involved,* the communism of defendants, if any existed, was not collateral, but was relevant, material and important to prove design, plan, scheme, motive and tactics—all of which flow from the fact of being a communist or from picketing for a "communist dominated" union; and in any event any rights defendants might have had to object to such testimony were deliberately waived.

*Where irrelevant or hearsay or any incompetent testimony is elicited by questions which are not objected to,* and no timely motion is made to strike such testimony from the record, *the testimony is properly part of the record* and its credibility and weight are matters for the jury; *and its admissibility will not be reversed after verdict.* Cf. *Com. v. Brown,* 264 Pa. 85, 107 A. 676; *Forster v. Rogers Bros.,* 247 Pa. 54, 63, 93 A. 26; *Pyle v. Finnessy,* 275 Pa. 54, 57, 118 A. 568; *Com. v. Woloszchuk,* 133 Pa. Superior Ct. 470, 3 A. 2d 10; *Com. v. Retacco,* 82 Pa. Superior Ct. 79; *Com. v. Hay,* 80 Pa. Superior Ct. 503.

In *Com. v. Brown,* 264 Pa., supra, where the defendant was charged and found guilty of murder, this Court held it was not reversible error for a district attorney to ask defendant whether he was a deserter from the army where it appeared that *no objection was made* at the time to the question, or *until the court refused to permit defendant to give his reasons for deserting.*

In *Forster v. Rogers Bros.,* 247 Pa., supra, we said (page 63) : "This is the true rule: When irrelevant or

incompetent testimony is elicited by questions which are not objected to at the time they are put, and the trial is permitted to proceed with this testimony upon the record, a refusal of a request to strike it out, made after the witness has left the stand, will not be reviewed; in such a case the only course is to ask that the jury be instructed to disregard the testimony, and a refusal of this request can be assigned for error."

In *Com. v. Woloszchuk*, 133 Pa. Superior Ct., supra, the Court clearly and correctly stated the law as follows (page 473) : "It was the duty of the appellants to enter promptly their objections before an answer was given to the inquiry as to the prosecutrix's reputation. . . . If an objection is not entered promptly, the proper practice is to move at once, and before the witness leaves the stand, to strike out the testimony, and, if the court refuses to do so, take an exception: Commonwealth v. Hay, 80 Pa. Superior Ct. 503, 506; Commonwealth v. Brown, 264 Pa. 85, 107 A. 676. In failing to enter a timely objection, the defendants may be deemed to have been satisfied to have the questions asked. *A reversal will not be granted where the record indicates an acquiescence by a defendant in the alleged erroneous introduction of evidence*: Commonwealth v. Emery, 273 Pa. 517, 117 A. 338. . . . We said in Commonwealth v. Retacco & Retacco, 82 Pa. Superior Ct. 79, 80: 'The answers were responsive to questions to which no objection had been made; after responsive replies are so received, it is, generally speaking, too late to avoid their effect.' "

The majority, I believe, are likewise incorrect when they say the Commonwealth's evidence was inadmissible because communism was a *collateral* matter and hence no rebuttal testimony was admissible on this point. We said in *Commonwealth v. Petrillo*, 341 Pa. 209, 224, 19 A. 2d 288, "Wigmore [On Evidence, Third

Edition, Volume 3] says in section 1003: *'The only true test [of "collateralness"] is that laid down in Attorney-General v. Hitchcock, 1 Exch. 99 Pellock, C.B.' Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?"*

Under the "Mollie Maguires" and "Black Hand" and other cases hereinabove cited, it seems clear that membership in the Communist Party or communist activities or employment by a communist dominated union could properly have been shown in evidence for the purpose of proving motive, scheme, plan or design, *independently of the contradiction of Truitt.*

Furthermore, defendants are not helped by the fact that some of the evidence which was *admitted without objection,* was "hearsay". The majority opinion overlooks the established principle of law that, as so aptly stated by Mr. Justice (now Chief Justice) DREW, in *Harrah v. Montour Railroad Co.,* 321 Pa. 526, 528, 184 A. 666: " 'Where evidence, incompetent as hearsay, is admitted without objection and is relevant and material to the fact in issue, *the court may give it the value of direct evidence'*: Poluski v. Glen Alden Coal Co., 286 Pa. 473, 476." In *Poluski v. Glen Alden Coal Co.,* we said (page 476): " 'A rule of evidence not invoked is waived': Wigmore, vol. I, section 18. *'Inadmissible evidence, including hearsay evidence, admitted without objection, is not a nullity or void of probative force,* but is to be given its natural probative effect as if it was in law admissible: 10 R.C.L. 1008. *This is true even in a criminal case'* :".

Appellants represented by experienced counsel made no motion to strike out any testimony; no request was made to instruct the jury to disregard the testimony; and no exception was taken to the charge of the court. Moreover, at the conclusion of the trial, in response to

a question of the court as to whether he had anything to say, counsel for the defendants said: ". . . I have nothing to say with reference to the trial of the case. I am not quarreling with the trial of the case. To my mind it was just another case that was tried just like other cases, and outside of always being interested and trying to do the best I can for the defendants, I am satisfied with the verdict. *I'm satisfied with the case as tried.* The verdict, if it were tried today, the verdict would be just the same." Counsel, after pleading for leniency, then asked each of the defendants if he would like to say something, and each of them replied "no".

The trial judge who saw and heard the witnesses said that in his opinion "the defendants, . . . none of whom belong to the union in which they purported to represent, were gathered from [distant] points . . . as members of the communist party, to foment trouble and to create strife and confusion"; and that *"we are of the opinion that this case was tried as the defendants wished to have it tried"*. In confirmation of this later statement by the trial judge, the Superior Court said (169 Pa. Superior Ct., page 335) : "Trial counsel was satisfied to have appellants interrogated relative to their alleged communistic connections and activities and their relation with Local 65. . . . At the argument before this Court, junior trial counsel for appellants stated to this Court that during the trial he had asked the senior trial counsel to object to the cross-examination relative to such communistic connections and activities on the part of appellants, and that the senior trial counsel said he would not object and that he wanted such testimony to go into the record."

How then is it possible to reverse because of the alleged inadvertence of the court or the alleged carelessness of counsel when the case was tried in accordance with the deliberate and carefully planned strategy of the defense?

The easiest thing in the world for new or second choice counsel to do is to criticize nearly everything that an experienced or reputedly competent trial lawyer did or failed to do. Moreover, it is not, and I believe should not be, part of the function of a Judge to be an armchair strategist for the defense. A defendant, no matter how bad his criminal record may be, has the mantle of innocence draped around his shoulders as soon as he is arrested; his crime must be proved beyond a reasonable doubt; the jury must be unanimously convinced of his guilt; under the Courts' decisions, he is protected against the police, against the Commonwealth's witnesses, against the district attorney, against the trial judge; and now he is to be protected against the unsuccessful strategy, the assumed ignorance or stupidity or the imagined neglect of his experienced lawyer. On behalf of all law-abiding citizens, I protest against this trend in favor of the criminal; I believe more thought and consideration should be given to protecting the rights of the decent-living people instead of the rights of violators of the law or hardened criminals.

In today's chaotic, fluctuating and constantly changing world, psychology and tactics play an important part. A trial lawyer should be allowed to try his client's case as he believes best for the client, and it is he and not the succeeding counsel or the Court who has the right and the duty to decide the strategy, the psychology and the tactics of the trial. I am convinced that appellate lawyers and appellate judges should stop being "Monday morning grandstand quarterbacks".

As so aptly said by President Judge RHODES in his opinion in this case, 169 Pa. Superior Ct. 326, 335, 82 A. 2d 699: "Although present counsel may have tried the case differently, this does not warrant a reversal or serve as a reason for a new trial. A defendant is

free to choose his counsel, and counsel must be left free to try the case as he thinks best. When a defendant is represented by competent counsel of his own choice, it ought to be an exceedingly rare case where an appellate court would declare it fundamental error for the trial court to receive evidence which was introduced without objection. On this occasion appellants' counsel deliberately chose to try the case as he did, and he and his clients must abide by the result. Trial strategy and the conduct of the defense are matters which must be left largely to the judgment of trial counsel. United States ex rel. Darcy v. Handy, D.C.M.D. Pa. 97 F. Supp. 930; Com. ex rel. Darcy v. Claudy, 367 Pa. 130, 133, 79 A. 2d 785." See to the same effect: *Com. v. Thompson,* 367 Pa. 102, 79 A. 2d 401.

The defendants themselves, trial counsel, trial Judge, Court en banc, and all the six sitting Judges of the Superior Court of Pennsylvania found nothing prejudicial in the trial of this case. I agree with them.

I would affirm the judgment of the Superior Court which in turn unanimously affirmed the judgment of the Court below.

Justice LADNER joins in this dissent.